[Civ. No. 36318. Second Dist., Div. Five. Sept. 24, 1971.]

MARSHALL KADNER et al.,
Plaintiffs, Cross-defendants and Respondents, v.
LARRY R. SHIELDS, Defendant, Cross-complainant and Appellant.

254

## Counsel

Arnold J. Stone and Marvin Gross for Defendant, Cross-complainant and Appellant.

Simon Taub and Daniel J. Jaffee for Plaintiffs, Cross-defendants and Respondents.

## Opinion

**REPPY, J.**—This is an appeal from a judgment in favor of the buyers of a luxury tract home in Beverly Hills deciding that the buyers had the right to determine by their purely personal considerations whether they were satisfied with the terms and conditions of an encumbrance which they were to assume, that the buyers did disapprove of certain provisions thereof in good faith, that they thereupon had the right to, and did, rescind the agreement to buy, that they were entitled to the return of a partial down payment placed in escrow, that the seller had wrongfully instructed the escrow agent

not to return the down payment, thereby entitling the buyers to interest on the down payment from that date, and that the seller had no right to recover damages from the buyers for alleged breach of contract.

On May 5, 1966, by means of the execution of escrow instructions, respondents Dr. and Mrs. Kadner (the Kadners), as purchasers, and appellant Larry R. Shields (Shields) as seller, entered into a contract to buy and sell a new home on Cole Place in Beverly Hills, part of a luxury tract development, for a purchase price of $225,000. The home had been constructed and encumbered with a $124,000 first trust deed by Shields several months earlier. Home Savings and Loan Association (Home) was the beneficiary of the trust deed. It was recognized that, as of the assumption date, the $124,000 note secured by the first trust deed would have been reduced to some extent (what representations were made in this regard became subject to dispute). The escrow agreement provided that the lesser balance of principal would be adjusted in cash through the escrow. United California Bank (the Bank) was escrow agent for the sale.

The Kadners deposited $10,000 of a called-for approximate $71,000 cash down payment. The first trust deed was to be assumed by the Kadners. The promissory note it secured was payble at the rate of $851 per month. There was to be a $30,000 note from the Kadners to Shields secured by a second trust deed. Part of the escrow agreement was a "satisfaction clause" drawn by the attorney for the Kadners, added at the last, reading as follows:

"ADDITIONAL ESCROW INSTRUCTIONS:

"The terms and conditions of the existing first encumbrance are subject to the written approval of the buyer within seven days after a copy thereof is delivered to the buyer."[1]

After receiving a copy of the Home promissory note, the first deed of trust securing it, and a beneficiary statement showing the amount of principal remaining due, the Kadners sent a letter to the bank, with a copy to Shields, stating that they disapproved of two provisions in the Home promissory note (quoting them),[2] additionally that the stated $122,795.70 balance of the Home note was considerably less than had been represented

---

[1]This superseded a clause in the printed form which said that the property was free of encumbrance except for the deed of trust securing the original amount the terms of which were familiar to *and approved by the Kadners.* We note that another proviso gave the same right of approval of "CCRs."

[2]On the basis of the wording of the satisfaction clause, which called for the buyers' approval of the encumbrance within seven days, technically it would appear that all the Kadners had to do was to passively fail to approve the Home note and deed of trust after giving them reasonable consideration during the seven days, but they chose the active route and must be tested by this.

(thus requiring a commensurately higher down payment), and finally that, for those reasons, the escrow was cancelled and a return of the deposit demanded.

The two disapproved provisions in the Home promissory note were (paraphrasing): (a) an acceleration clause: should default be made in performance, at the option of Home, the whole sum should be immediately due and payable[3] and, also at the option of Home, bear interest during default at 2 percent higher than the regular amount (which was 7.2 percent); (b) a prepayment clause: if, in any calendar quarter, payments should exceed 20 percent of the original amount of the note, Home would require 130 days' interest on the original amount.[4]

Shields did not accede to the attempted cancellation of escrow and instructed the Bank not to return the deposit.

The Kadners purchased a different house on Challette Drive, under terms in which the price was $165,000, the down payment was $40,000 to $45,-000, and the monthly payments were $747. A promissory note and first trust deed therefor, also with Home, were dated July 12, 1966. The documents contained default-acceleration and prepayment-penalty interest clauses identical to those involved in the Cole Place residence. The promissory note was for $110,000. There is no specific showing in the record that there was a second deed of trust, but the inference is, of course, that there was in an amount between $10,000 and $15,000.

The Kadners filed suit on July 18, 1966, alleging the contract of May 5, the escrow deposit pursuant thereto, the circumstance that the two clauses in the Home note proved to be unsatisfactory to them, the fact of having given notice thereof, the existence of a controversy over whether the con-

---

[3] We note that the Home trust deed provided that upon default by trustor in payment of any indebtedness it secured, beneficiary might "declare all sums secured . . . immediately due and payable by delivery to trustee of a written declaration of default and demand for sale, etc."

[4] Both parties refer to a clause in the first trust deed giving Home the right to accelerate the note in case of sale of the house. We assume it was this language: "To PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:

" . . . . . . . . . . . .
"12) That if the Trustor shall sell, . . . said property, . . . without the written consent of Beneficiary being first . . . obtained, Beneficiary shall have the right, at its option, to declare any indebtedness . . . secured hereby, . . . immediately due and payable." The Kadners complain of this item as a hardship factor. However, they did not specifically disapprove this in their notice so any claim of reasonable concern over this feature is irrelevant. Anyway, it seems clear that the Kadners were purchasing with the intention of long-term occupancy, with resale only a likelihood in event of an unanticipated emergency. Dr. Kadner testified that if something adverse happened from health or financial reasons, he might have to sell quickly. No doubt this is why no disapproval was registered as to this clause in the notice.

tract was rescinded, and their desire for a judicial declaration that it was. They prayed for such a declaration, for a return of the deposit, and for other relief. Shields filed an answer and in due course a fourth amended cross-complaint alleging the execution of the contract, performance on his part, the Kadners' breach of the agreement by their "notice," and his sufferance of damages consisting of the difference between the contract price and the amount for which the residence could be resold plus interest on the down payment and on the $30,000 note to him plus various stated expenses. Before the trial of the action, a stipulation was entered into that the Bank could be dismissed and would be later instructed on the method for disbursal of the deposit. As indicated, judgment was in favor of the Kadners, and Shields has brought this appeal.

Shields contends that the approval clause in the agreement did not create a condition precedent, that the trial court applied the improper test for satisfaction as to the terms of the Home promissory note (personal judgment instead of reasonable man standard), that in any event there was no substantial evidence to support the finding of the trial court that the Kadners exercised their personal judgment in good faith, and that, assuming an adverse consideration of these claims, the trial court improperly awarded interest on the $10,000 deposit.

Before proceeding to a discussion of these contentions, we note that both sides now agree[5] that the approval clause set up a so-called "satisfaction" feature.

Shields' contention that the approval provision was not a condition precedent clause is based on the concept that properly interpreted the phrase simply gave to the Kadners the election of assuming the Home encumbrance if they were satisfied with it or of securing new financing if they were not, and not the right to withdraw from the transaction. However, we believe that a condition precedent was created. Although the wording was drawn by the Kadners (bringing into play the rule of construction against the drafter (5 Williston on Contracts (3d ed.-Jaeger 1961) § 675, pp. 188-189; 4 Williston on Contracts, § 621, p. 760) and does not state that the entire agreement is contingent upon the Kadners' approval (see *Rodriguez v. Barnett,* 52 Cal.2d 154, 157 [338 P.2d 907]), the surrounding circumstances and overall tenor of the agreement militate for a condition precedent.[6] (See 5 Williston on Contracts, *supra,* § 663, p. 127.)

---

[5]At trial, Shields urged that the approval provision was not a true satisfaction clause.

[6]There is the possibility that we have a minor condition subsequent as relates to the right of the Kadners to the return of the $10,000 deposit, being the only part of the total performance called for which the Kadners had carried out. The condition subse-

Firstly, the way the provision for the Kadners' assumption of the Home encumbrance is set out indicates that it was for the benefit of Shields. What would make it so would be an understanding, which it must be assumed the trial court determined existed, that lacking such an assumption of the Home note Shields would have had to defray the prepayment interest penalty to Home which would have been involved in refinancing.[7] Thus, in effect, the Kadners had to assume the Home encumbrance unless Shields decided otherwise, and it was proper to afford the Kadners the right to approve the terms of the Home promissory note.

Secondly, coupled with this approval clause was another one involving covenants, conditions and restrictions, and so forth,[8] which obviously were not open to an alternate arrangement which could be substituted with the main contract remaining intact.

It perhaps is debatable whether the precedent condition, which we believe the satisfaction clause set out, was as to the existence of the contract or as to the duty of immediate performance by the Kadners of the balance of their obligations, to wit, completing the down payment, assuming the Home note and deed of trust, and executing the $30,000 promissory note to Shields and the second deed of trust securing it. However, most generally, condition precedent clauses relate to the duty of immediate performance, and we feel that that is the reasonable interpretation in this case. (See Rest., Contracts, § 250, p. 359; § 254, p. 365; 5 Williston on Contracts, *supra*, § 666, pp. 138-140; § 666A, pp. 141-142. Generally, for what words create a condition precedent and for aids to interpretation see 5 Williston on Contracts, *supra*, § 671, p. 160, and § 672, p. 165.) If the condition is not fulfilled, the right to enforce the contract does not evolve. (5 Williston on Contracts, *supra*, § 663, p. 127.)

One of the most significant issues before us is whether the Kadners' approval of (satisfaction or dissatisfaction with) the terms of the Home note was to be measured strictly by good faith discernment of the individual

---

quent would be the Kadners not having approved the Home encumbrance within seven days after receipt of a copy of it. The duty of immediate performance of depositing the $10,000 partial down payment in escrow, as was known by the parties, was existent before the Kadners would receive a copy of the Home note their approval of which was requisite to their other obligations.

[7] Evidently Shields had a general understanding with Home that it would go along with an assumption by Shields' buyers.

[8] Satisfaction with such items, we feel, would be just as clearly, if not more clearly, subject to the reasonable man test as would satisfaction with terms of the Home promissory note (quite akin to a soil compaction and map feature [*Collins* v. *Vickter Manor, Inc.*, 47 Cal.2d 875, 882-883 (306 P.2d 783)]; but see *Pruitt* v. *Fontana*, 143 Cal.App.2d 675, 684 [300 P.2d 371]; overruled by *Mattei* v. *Hopper*, 51 Cal.2d 119, 125-126 [330 P.2d 625], to the extent it suggested there could never be a reasonable man test in "judgment" cases. *Mattei* also points out that *Pruitt's* reference to the subjective discretion test "was not necessary to the result reached." (P. 125.)), thus precluding any argument that a personal judgment test as to these would suggest that the same test was intended for the Home promissory note.

person or by the objective considerations of the reasonable man. Two tests are recognized when satisfaction as to performance or as to the status of something involved in the negotiations (the latter is our case) is afforded to one party to an agreement: (1) the pure judgment or discernment of the individual person, controlled only by the element of good faith; (2) the judicially determined judgment or discernment of the so-called reasonable man. (See 5 Williston on Contracts, *supra,* § § 675A and 675B, pp. 189-218; 3A Corbin on Contracts, § § 644-646, pp. 78-102.) To some extent the same factors are involved in each gauge, but the individual test has much more of the feature of personal feeling in it. There is no easy demarcation between which of the two tests is to be applied in most cases. As the Williston work puts it: "[I]n truth, the difference between contracts in this respect is almost wholly one of degree, and in most cases, it is out of the question to decide upon which side of the line a given case falls until the highest court has passed upon the case." (5 Williston on Contracts, *supra,* § 675A, p. 205.) Corbin says: "By drawing the distinction between contracts for a performance involving . . . personal fancy and contracts for a performance that can be measured by objective and uniform tests, it is not meant to assert a hard and fast line can be definitely drawn. The difference is one of degree. In the extreme cases, the difference is very great and the classification of a specific contract is easy . . . . It is therefore a serviceable classification, even though there are many cases in which it renders no service whatever." (3A Corbin on Contracts, *supra,* § 646, p. 94.)

The particular satisfaction circumstance found in the instant case does not appear to have been dealt with in any published appellate decision. From the standpoint of California cases, it seems to fall somewhere between *Mattei* v. *Hopper,* 51 Cal.2d 119 [330 P.2d 625] and *Weisz Trucking Co.* v. *Emil R. Wohl Constr.,* 13 Cal.App.3d 256 [91 Cal.Rptr. 489].

Although the trial court gave one intimation while the case was being argued that it might consider applying the objective reasonable man test,[9] at the conclusion of the argument it strongly indicated that it would use the subjective personal judgment gauge, though advising it would make its final consideration at the time of executing the findings of fact. It is clear from those, and the conclusions of law, that the trial court then did adhere to the personal satisfaction test with its concomitant requirement of good faith.[10]

---

[9]"THE COURT: He [Dr. Kadner] is at default . . . and he says, 'I don't like that idea [of acceleration], but I am going to get out of it, see my lawyer and see if it is *reasonable* for me to say that I don't like that clause. . . .' " (Italics added.)

[10]Finding V: "[The Kadners'] . . . 'Notice of Disapproval . . .' dated May 26, 1966, was given in good faith . . . ." ¶ Conclusion II: "[The Kadners'] disapproval of the acceleration and penalty clauses . . . was made in good faith."

■ Although there is much in the record to indicate, as a matter of law, that the Kadners did not act in good faith in disapproving the terms of the Home promissory note to the extent that they did,[11] we need not make

---

[11]The request by the Kadners that their note to Shields contain a clause reserving the right to pay any part of it off prior to maturity showed their awareness that typically there would be restrictions in this regard.

The Kadners' concern was that the interest, monthly payment, and the term of the Home note were 7.2 percent, $851, and 29 years, respectively, as represented, and this concern was the main reason for the approval-of-terms clause. Sally Hancock testified that a few days before May 5, Dr. Kadner telephoned her and told her that his attorney thought it best to have the clause "to make sure that it was 7.2 [interest] 29 years, payable $831 [sic—$851] per month." This was not denied by the doctor, although he took the stand on rebuttal and refuted some conversation versions put forward by Shields. The point is not that these were the only terms subject to approval but that matters having to do with acceleration and prepayment (something as to which the Kadners must have expected to encounter) were not sufficiently important to him to mention ahead of time, and good faith in support of an objection on their specification would be less readily established.

Both parties agreed that Dr. Kadner called Shields about May 20, before copies of the Home note and deed of trust were mailed to him. (A reference was made once by Shields to the 18th, 19th or 20th but was then confined to the 19th or 20th. Dr. Kadner referred to the 18th, 19th or 20th. For convenience we use only the 20th in our opinion.) There is a conflict in the evidence as to what was said. Shields testified that Dr. Kadner said that he was not able to complete the purchase because of personal problems, tax problems and other things. He denied that the doctor said that he had received the beneficiary statement and it showed too low an unpaid balance which would make a larger requirement of cash than expected and that he would have to reconsider in light of the financial development. He also denied that for the first time they talked about enlarging the second trust deed. Dr. Kadner testified on rebuttal that the substance of his statement to Shields was that he had received the beneficiary statement, that it was lower than expected and that Shields had misrepresented it; that he asked what arrangement or alteration could be made; that they discussed his other financial position; that he pointed out that the item was important to him, his financial arrangement was tight, and he and his wife were considering the whole deal.

Whether or not the Kadners had received the beneficiary statement before the doctor called Shields would be crucial as to which version is correct. There is a hodge-podge in the record as to this, with the most telling account, brought out by the Kadners' attorney himself, being that the beneficiary statement was mailed by the bank to the Kadners on May 24 (see *infra*). This would make Shields' version the more plausible.

A review of the conflicting material is as follows: When Dr. Kadner first testified that he did receive a beneficiary statement, he also said that he first learned how much less than $124,000 the unpaid balance on the Home note was "[w]hen it came to sign the final papers. . . ." Although a query to the doctor as to what he meant by the final papers got sidetracked, his own counsel intimated that the reference was to the prospective writing which would approve the terms of the first encumbrance. This would tie in with a receipt of the beneficiary statement with the communication of May 24 (see *infra*).

After Shields testified, Kadner took the stand in rebuttal and said that he first learned the exact amount of the unpaid balance on the Home note when he got the beneficiary statement from the bank "in the middle of May." He then responded affirmatively to his counsel who pointed out to him that the bank had received the

the difficult decision of whether such evidence is strong enough and any contrary intendments are so insubstantial as to make nonrequisite the usual concession to the weight-evaluating and conflict-resolving prerogatives of

beneficiary statement on May 13 and then asked him the leading question if it would be a day or two thereafter.

However, Miss Gannon, escrow officer of the bank, and obviously a neutral witness, gave this tentatively confusing but seemingly ultimately settled account. She testified that the bank received the beneficiary statement from Home on May 13. The following colloquy between her and Mr. Hirsch then followed:

"Q. . . . Did you mail a copy of the beneficiary statement to Dr. and Mrs. Kadner? ¶ A. I did. ¶ Q. When? ¶ A. Wait a minute. I didn't. . . . I handed a copy of the beneficiary statement with the financial statement form to be completed by Dr. and Mrs. Kadner . . . [,] the escrow instructions and the signature card . . . to Mr. Shields to be delivered to [the Kadners]. ¶ Q. Would you look at your instructions dated May 24, 1966, please? ¶ A. Yes. ¶ Q. All right. And that is instructions relative to preliminary report of title? ¶ A. Right. ¶ Q. Beneficiary statement in terms and conditions of first encumbrance, is it not? ¶ A. Right. ¶ Q. Does that refresh your recollection of what you did in respect to the beneficiary statement? ¶ A. Oh, here it is. On May 24th we mailed a copy of the note, a copy of the deed of trust, and two copies of the beneficiary statement together with the instructions dated May 24th. ¶ Q. All to Dr. Kadner? ¶ A. To Dr. and Mrs. Kadner."

The transmittal letter of May 24, 1966, if there was one, is not an exhibit. The only information we have on it is the reference in the reporter's transcript in course of examination of Miss Gannon. This refreshed her recollection that she sent the beneficiary statement with it, so it must have shown it as an enclosure. There was a letter from the bank to the Kadners dated May 18 (plaintiffs' exhibit 7) which indicated enclosure of a preliminary title report and plat issued by Title Insurance and Trust Company and conditions and restrictions. This was signed by C. G. Valenzuela. It made no reference to a beneficiary statement being enclosed. Also there is endorsed on the face of the beneficiary statement the legend: "del. to L. Shields. Also Financial Stmt. & sig. Card." But there is no indication of accomplishment or a date therefor. In the early part of his testimony, Dr. Kadner testified that Shields brought something for them to sign early in May; that when Shields showed him the document, it indicated that the down payment was more money than he thought. However, Dr. Kadner further testified that he did not think the document had exact figures. The first portion of this testimony might have lent some support to the intermediate statement made by Miss Gannon that she had delivered the beneficiary statement along with a financial statement form to Shields for transmittal to the Kadners. However, the latter portion of the testimony seems to rule this out, and in any event, Miss Gannon, when shown some kind of instruction document dated May 24 by Mr. Hirsch, had her memory refreshed to the effect that she had mailed the beneficiary statement with a copy of the Home note and deed of trust to the Kadners on that date. Rather, the above referred to testimony of Dr. Kadner would indicate that Shields showed him some notation indicating the approximate unpaid balance on the Home note, perhaps at the time that the amendment to the escrow instructions was executed, about May 5, 1966.

Miss Gannon's statement is compatible with Dr. Kadner's first indication that the beneficiary statement came at a time coincident with when the Kadners were expected to sign a written consent to the terms of the first trust deed. It is more likely then that this topic was included in the subject matter of the telephone conversation which Dr. Kadner said he had with Shields after he had given instructions for the sending of the disapproval letter.

In any event, it left the true subject matter of the conversation of May 20th in a most conflicting state. This was a crucial factor in relation to the good faith issue.

the trial court. This is so because we believe that the trial court did apply the wrong satisfaction standard in this particular case. We feel that the objective measure of reasonableness was the proper one. Under that standard, it is possible for a determination that a given status of things is unsatisfactory to be an unreasonable one, even though it is made in personal good faith.[12]

■ Which test is to be used in a given transaction is a matter of actual or constructive (legally presumed) intent of the parties. (See discussion in 5 Williston on Contracts, *supra*, § 675A, pp. 201-207.) ■ The choice can be settled of course by explicit language in the instrument. We feel that that is lacking in the instant case. So it is one of constructive intent. The absence of such explicitness in the instant case militates against a judicial decision in favor of the subjective personal judgment criterion in two ways:

---

We note that Shields asked for a special finding on this point which the trial court denied. Under Code of Civil Procedure section 634, we may not infer that the trial court found in favor of the prevailing party on this subissue.

It is noted that Mr. Hirsch twice made the assertion that the beneficiary statement had been mailed by Miss Gannon on the day following the bank's receipt of it from Home, i.e., on the 14th. This, of course, was a complete, but perhaps understandable misrecollection.

Also, it is significant that Dr. Kadner, in a portion of his deposition which was brought to the attention of the court, testified that he told Shields on May 20 that he was not going to go through with the deal. Moreover, Mrs. Hancock testified that Dr. Kadner called her on the 20th and told her that he was afraid he was not going to be able to go through with the deal because of taxes and some other things. She stated that she recalled this because it tied in with her losing the deal. Although Dr. Kadner, on rebuttal, presented a different account of his call to Shields, he did not deny the testimony of Mrs. Hancock. It is hard to come to the conclusion that the trial court disbelieved this part of the testimony of Mrs. Hancock *in toto*. The more rehabilitative prospect for the Kadners is the concept that the doctor's refutation as to Shields impliedly was a refutation as to Mrs. Hancock.

Even if the version of the doctor were to be accepted, it indicates a viewpoint by the Kadners that they had made a deal which they now regretted and a desire by them to get out of the transaction, all before they ever saw the terms of the Home note and encumbrance.

Of additional significance is the testimony of Dr. Kadner that between May 28 and June 1, after he had given his notice of rescission, he negotiated with Asher Dann, Shields' employer, about adjusting the amount on the second deed of trust so as to absorb the additional amount of down payment the doctor claimed he had not anticipated. There would have been no point to these negotiations if the Kadners were adamantly unwilling to carry out the transaction with the assertedly objectionable penalty and acceleration clauses in the Home note.

We note, finally, that when asked by Mr. Hirsch, why, after he had learned of the terms of the trust deed, he decided to withdraw from the transaction, Dr. Kadner testified that "after seeing the problem that we would be in if we did not keep the payments, *possibly* I decided that I couldn't undertake the responsibility of buying the house subject to the larger penalties of the loan." (Italics added.)

[12]Under the other standard a personal determination of dissatisfaction can be unreasonable and still be valid as long as it was in good faith and not fictitious, covering up other unallowable reasons.

(1) It was within the province of the Kadners' attorney to have spelled out in the amendment to the escrow that the propriety of their disapproval of any of the terms of the Home promissory note should be measured by the subjective personal gratification test. ██ Therefore, other things being equal, the construction should be against the position urged by the Kadners (4 Williston on Contracts, *supra,* § 621, p. 760). (2) In the absence of a specific expression in the instrument or a clear indication from the nature of the subject matter, the preference of the law is for the less arbitrary standard of the reasonable man. (5 Williston on Contracts, *supra,* § 675A, pp. 201, 206-207 ["[I]n case of doubt the [reasonable man standard] as the less harsh would appropriately be adopted." (P. 207.)];[13] see also § 675, p. 189 and 4 Williston, § 620, p. 741; 3A Corbin on Contracts, § 645, pp. 88-89 and § 647, p. 104; Rest., Contracts, § 265, p. 380.)[14]

██ In cases where the personal judgment test has been applied, the situation most frequently is one of a matter of esthetic taste and sometimes of feasibility of operation or management irrespective of financial impact. Neither feature is involved here. Moreover, the decisions teach that in those nonspecific situations (other than the furnishing of esthetic endeavors or works wherein the element of taste clearly makes personal satisfaction appropriate) where the personal satisfaction test has been held to apply something more than financial impact appears to be involved, such as compatibility of personality or ease or workability of operation. For instance: in *Mattei* v. *Hopper, supra,* 51 Cal.2d 119 [330 P.2d 625], the problem of compatibility between various tenants as well as between lessor and lessee and the workability of the leasing operations (irrespective of possible financial pitfalls) were involved; and in *Rodriguez* v. *Barnett, supra,* 52 Cal.2d 154 [338 P.2d 907], if indeed that decision can be classified as a personal satisfaction one, of which we have some serious doubts,[15] workability of a final subdivision map was stressed as a factor independent of economic feasibility.

---

[13]The Williston work adds that there can be no criticism so long as a court does not refuse to give effect to a clear intention in the contractual documents for the personal satisfaction test. (5 Williston on Contracts, *supra,* § 675A, p. 207.)

[14]The case of *Van Demark* v. *California Home Extension Assn.* (1919) 43 Cal. App. 685 [185 P. 866], appears to be out of harmony when it says that where there is nothing in the contract to justify a contrary construction, the general rule is that the party is the judge of his own satisfaction subject only to the element of good faith. However, we note that in *Van Demark* even though the court felt that the agreement called for the personal judgment of the buyer, it took pains to point out that there were grounds (a reasonable basis) for dissatisfaction: The eucalyptus trees had suffered an injury caused by unreasonable frost which injury was beyond the power of the buyer to prevent.

[15]This decision is somewhat of an anomaly. The Supreme Court at pages 160-161 opined that the right of the subdivision buyer to find itself dissatisfied with the map proposed by the city was not at its "own unrestricted pleasure." The high court

Furthermore, the objective gauge of the reasonable mind is generally applied where factors of commercial value or factors of financial concern are involved.[16] For instance: In *Melton* v. *Story,* 113 Cal.App. 609 [298 P. 1032], the reasonable man test was applied where a bond house was to purchase "realty bonds" and it had the right to make an independent appraisal of the land standing behind the bonds and did not have to buy if the appraisal was not satisfactory to it. The Court of Appeal cited out-of-state cases which it, no doubt, felt applied the reasonable man test and which involved as to one approval of the financial status, as shown by its books, of a corporation, the stock of which the buyer was contracting to purchase and as to the other satisfaction as to the legality of proceedings leading to the issuance of bonds to be the subject of purchase. (Pp. 613-614.) In *Leboire* v. *Royce,* 53 Cal.2d 659 [2 Cal.Rptr. 745, 349 P.2d 513], the reasonable man test was applied where the liability of a party, on forming a joint venture, for the attorney's fees to be paid to a firm handling an

---

specified that an "objective criterion" controlled "the exercise of the right to determine satisfaction"; that the trial court finding that the buyer's refusal to approve the map "was reasonable" supported the determination that the "objective criterion" was present. However the Supreme Court designated the objective criterion as "good faith." Perhaps what the Supreme Court has said is that the standard of approval is subjective, strictly at the personal evaluation and choice of the buyer (he can actually make a decision which in the greater probability of things the judicially manufactured reasonable man would not), but whether he did this in good faith must be examined quite objectively and without giving particular weight to any mere personal assurances of the buyer that he, indeed, was forthright. (Compare *Collins* v. *Vickter Manor, Inc., supra,* 47 Cal.2d 875 [306 P.2d 783], where a soil compaction report and a final contour map were subject to the buyers' approval, in which the Supreme Court ruled that the standard of the soil report and the map had only to be such "as would be satisfactory to a reasonable person" (p. 882), and as would "meet reasonable standards for the commercial purpose of subdivision" (p. 883).)

[16]By analogy, where an item which is to meet the satisfaction of a contracting party has been spawned in the crucible of commercial activity, the validity of any designation of disapproval should be measured through the viewpoint of the reasonable man.

Some of the discussion in Corbin on Contracts illustrates the principle point: ". . . The making of a 'satisfactory profit' and the establishment of 'proper business connections' have been held to be matters that can be determined by objective and impersonal tests. ¶ Contracts for the sale of goods on credit, for the assignment of leases, and other credit transactions, often specify that the character and credit of the party to be trusted must be satisfactory to the party taking the risk. If the latter takes care to make his promise expressly conditional on his own personal judgment, there should be no doubt as to the legal effect. The cases indicate some doubt, however, if the risk-bearer does not make his own promise thus expressly conditional, but merely obtains the other party's promise that the security and credit shall be satisfactory to him. In some cases of this kind, personal satisfaction has been held a condition; [footnote omitted] others are contra, on the ground that character, credit, and security are measurable by customary objective tests. [Footnote omitted.] It is true that with respect to many businessmen there are fairly reliable credit ratings in common use. In other cases, this is not true. The decision should vary with the facts, so that the security contracted for may always be received substantially." (Vol. 3A, § 646, pp. 100-101.)

appeal of a claim which had been successfully adjudicated against the other joint venturer was subject to that party's approval as to the amount of such fee. The Court of Appeal reasoned that "the approval . . . provision was only incidental to the basic obligation to pay a reasonable fee" and that the clause "did not import a standard of personal satisfaction." (P. 672.) The attorney's fee it was said, had a " 'commercial value or quality.' " (P. 673.) In *Collins* v. *Vickter Manor, Inc., supra,* 47 Cal.2d 875, the seller was to furnish a soil compaction report from a reliable testing firm with respect to building sites, which report was to be satisfactory to the buyers. In addition, a final contour map and filing map were subject to the buyers' approval. It was held that the contract called for such performance as would be satisfactory to a reasonable person. The Supreme Court said that it determined from the agreement as a whole that the soil report on the maps should meet reasonable standards for commercial purposes of the subdivision of property. (Pp. 882-883.) (Similarly, there would be reasonable business standards attendant to the financing of luxury tract homes.) In *Weisz Trucking Co.* v. *Emil R. Wohl Constr., supra,* 13 Cal.App.3d 256 [91 Cal.Rptr. 489], a subcontractor was to have a performance bond written by a surety company "acceptable to the contractor." The contractor would not accept a bond from a surety company having a Treasury rating of only $61,000 as compared to a desired rating of $500,000. The Court of Appeal held that in assessing the action of the contractor, the objective standard of the reasonable person should be utilized as is done where contracts call for satisfaction as to a commercial value. This, despite the fact that the contractor obviously had concern over the financial reliability of the surety company, the solvency of which would be at stake.

Three out-of-state cases are of interest. In *Ard Dr. Pepper Bottling Co.* v. *Dr. Pepper Co.* (5th Cir. 1953) 202 F.2d 372, the personal satisfaction test was applied to the clause in the contract which gave Dr. Pepper the right to cancel if the local bottling works was not faithfully promoting the business and properly merchandising the product. The good faith of Dr. Pepper was found as a matter of law. However, in this case there was a rather specialized operation with a fairly unique product, and there were idiosyncratic aspects in the promotion area. In *Simpson* v. *Prudential Ins. Co. of America,* 227 Md. 393 [177 A.2d 417, 425], the policy involved stated that the insurance company could determine to its satisfaction if the potential insured was insurable. It was held that the objective standard should be applied. No doubt the court bore in mind that there were general standards in the industry on insurability. (Certainly the same is true in the field of financing with respect to residential developments, both of the average and of the exclusive type.) (*Compare Brunt* v. *Occidental Life Ins. Co.,* 223 Cal.App.2d 179 [35 Cal.Rptr. 492] and fn. 61 on both

in 3A Corbin on Contracts, Express Conditions (1971 Supp.) § 644, pp. 31-32.) In *Commercial Mortgage and Finance Corp.* v. *Greenwich Savings Bank,* 112 Ga.App. 388 [145 S.E.2d 249], a contract obligated a finance company to deliver and the bank to purchase certain home mortgage loans. The bank's commitment was subject to the condition that: (1) house plans be subject to approval of the bank; (2) credit ratings of owner-occupants be satisfactory to the bank; (3) policies of title insurance be issued by title companies which were satisfactory to the bank; (4) all documents be in a form satisfactory to the bank's counsel; and (5) fire insurance policies be in amounts and with companies acceptable to the bank. In the lawsuit which developed, the positions of the parties were opposite to those in the instant case. The bank (which had the approval right, like the Kadners) sued the finance company for breach (failure to deliver mortgages for the bank to purchase). The finance company (whose rights depended on the other party's approval action, like Shields) defended on the basis that the contract was unenforceable as lacking in mutuality. It was held that a personal judgment standard was applicable which had to be exercised in good faith and that, therefore, the contract was valid. Although in *Commercial Mortgage and Finance Corp., supra,* some of the factors subject to satisfaction have to do with financial features, it is felt that none are the equivalent of those stemming from promissory note clauses of the nature under consideration herein, and that the existence of the many variables present in the numerous items which were the subject of consideration sets the *Commercial Mortgage and Finance Corp.* case apart.

Important, of course, in answering the question of which test should be applied, is the nature of the items which actually turn out to be the ones which become the subject of the disapproval action; certainly this is true in constructive intent cases.[17] In the instant case, the subject is initially set by the clause in question: it is "the terms and conditions[18] of the [Home] encumbrance." This would be the deed of trust and not the promissory note. The disapproval, of course, made reference only to two provisions in the note. Technically this may have been an incompetent disapproval.

[17]The trial court did not seem to appreciate this limitation.

[18]Although in one sense the unpaid balance due on the note might be considered its "condition," it is clear that this was not the sense in which the word "conditions" was used, which was, rather, in the concept of performance called for. The Kadners saw it this latter way, because they presented their concern about the lower balance (which meant a higher down payment) in a separate paragraph and as a secondary basis (resting obviously on alleged misrepresentation) for the act of rescission which was then specified. Thus on the approval of the Home encumbrance issue, any dissatisfaction with the higher down payment, if there was such, is not pertinent.

However, the clause is subject to the interpretation[19] that the concept of the word "encumbrance" is broader and encompasses the note (or that the deed of trust's referral to the note makes it part of what is subject to approval). It is further narrowed, we feel, to the particular terms specified in the notice of disapproval: the acceleration-on-default clause and the interest-penalty-on-prepayment clause. It is yet again narrowed to what could be considered the variable factors in these clauses, since the record shows that the Kadners had no objection to the intrinsic principle of acceleration on default or of interest penalty on prepayment: perhaps such things, as to the former clause, as a right to reinstatement from acceleration to the installment status and, as to the latter clause, as the percentage period and the amount of interest penalty.

Additionally, it is important not to view these items in isolation but rather to look at them in the transactional setting in which they exist. They are in a security device which is one of a number issued by a major financing entity supplying the funds for the development of a tract of luxury homes. Such security device is, in a sense, akin to a product put out by a large concern which is an integral part of a transaction entered into by the litigating parties. It is not the original negotiation of a personally tailored security arrangement, as was the situation between the Kadners and Shields with respect to the second promissory note and deed of trust. The particular clauses isolated by the Kadners are in a promissory note and deed of trust as to the principal amount and monthly payment and interest rate of which the buyer-assumers are knowledgeable and in agreement. (Only the unsustained factor of possible misrepresentation applied to these latter items.) We also note that the potential of these narrowed features for hardship concern related not to the present but to the future and was to a degree speculative, being tied into factors most likely out of control of the Kadners: the physical and mental well-being of the doctor and the national economy. Thus, a true personal evaluation is not involved.

There is nothing of personal taste connected with the acceptability of the aspects of these two clauses as to which disapproval was registered. There can be no basis for discrimination as to the language used to spell out the rights afforded to Home. It is not sensible to say that the consideration of what should be the makeup of the variable elements of these rights,

---

[19]The Home first deed of trust provided that it was for the purpose of securing the payment evidenced by the promissory note of even date.

Perhaps it is fair to indulge in a construction making the clause more broadly operable, giving the precept favoring that result (see Civ. Code, § 1643; *Lagorio* v. *Yerxa*, 96 Cal.App. 111, 117 [273 P. 856]), more weight than the rule that a provision should be construed strictly against the party preparing it. (50 Cal.Jur.2d, Vendor and Purchaser, § 20, p. 45.)

unchallenged as to principle, as they appear in the setting above described, should be at the strictly personal choice of the buyer-assumer uncontrolled except for the element of good faith. Involved is a matter of commercial practice and competitive action among the large financing institutions. At least, indirectly, there is a factor of commercial quality and value in the picture.

We conclude that the trial court erred in using the subjective personal judgment test. ■ This error, however, would not require reversal if the case, as a matter of law, would have to have been decided by the trial court the same way even under the reasonable man test. The readiness with which this could be decided would depend on how the burden of proof lies in these cases.

If the burden is on the party asserting the unreasonable character of the satisfaction determination of the other, then if the Kadners had some and Shields none, or both had no evidence of ponderable significance on the subject, the judgment should be affirmed. If it is the obligation of the party claiming he has been relieved of the duty of immediate performance because the nonoccurrence of the satisfaction condition to establish that his declination to express satisfaction with the item involved was reasonable, the judgment herein could be affirmed only if the Kadners had evidence of substance and Shields had none such.

Either way the burden goes, the existence of ponderably significant evidence on the side of unreasonableness, no matter what we might think the strength on the other side to be, will require reversal and retrial. As hereinafter elucidated, we believe there is such evidence. Nonetheless it is proper for us to treat with the matter of the burden of persuasion as a guide for the trial court.

It is not too clear where the burden of persuasion lies in the instant case. At our request respective counsel submitted supplemental briefs on this point, both of which were excellent and most provocative. ■ Generally, the burden is on the party maintaining the effectiveness of a contract and the enforceability of the duty of immediate performance of the other party, if there is a condition precedent to that duty of immediate performance, to plead and prove the occurrence of the condition precedent. (5 Williston on Contracts, *supra,* § 667A, p. 150; § 674, pp. 179, 182, 183; § 675A, pp. 201-202, fn. 10; *Ard Dr. Pepper Bottling Co.* v. *Dr. Pepper Co., supra* (5th Cir. 1953) 202 F.2d 372, 376; *Simpson* v. *Prudential Ins. Co., supra,* 227 Md. 393 [177 A.2d 417]; *Inman Mfg. Co.* v. *American Cereal Co.,* 133 Iowa 71 [110 N.W. 287].) The party asserting the validity of the contract and duty of immediate performance could be

a plaintiff or a cross-complainant. In the texts and decisions, no doubt because most of the cases fall that way, the designation for that party is "plaintiff." In our case, however, it would be Shields as a cross-complainant.

Despite the general rule, there seems to be considerable merit to the proposition urged by Shields that the burden of persuasion should be on the Kadners to satisfy the court that it is more probable than not that a reasonable man would not have found the default-acceleration and pre-payment-penalty clauses of the Home promissory note acceptable, on the dual bases that the condition was injected into the agreement at the very last by the Kadners and that the Kadners were the ones who had control over and were peculiarly knowledgeable about nonoccurrence of the condition. Shields cites *Morris* v. *Williams,* 67 Cal.2d 733, 760 [63 Cal.Rptr. 689, 433 P.2d 697], in support of the peculiar knowledge concept. However, it appears to deal with the burden of going forward, not with the ultimate burden of persuasion. Shields suggests that in the cases where the burden of proof is on the party seeking to enforce the contract, usually the condition involved is under the control of that party or neither party. Some certainly are in this category, but whether the inclusion of the adverb "usually" in Shields' thought is warranted is problematical. We are mindful of the observation in the Williston work relative to what is termed a "proviso" (that is, "a condition subsequent in form but precedent in operation") to the effect that "this form of statement will usually operate procedurally to throw upon the defendant [position of the Kadners] the burden . . . of . . . proving the proviso" (5 Williston on Contracts, *supra,* § 674, pp. 182-183);[20] but at the same time we have taken note that the final Williston paragraph on page 183 suggests that this rule may be outmoded.

In addition, the case of *Van Demark* v. *California Home Extension Assn., supra,* 43 Cal.App. 685 [185 P. 866], contains the intimation that in a situation similar to that of the instant case, it would be incumbent upon the buyer to prove facts constituting reasonable grounds for dissatisfaction with a matter put to his approval. In *Van Demark* there was a sale of land planted to eucalyptus trees. A clause in the agreement provided that if after making payment for the land, the buyer should be dissatisfied with his investment (the productivity of the tree-growing enterprise), the seller would buy the property back between the fifth and sixth years. At page 687 the

---

[20]The authors of the Restatement of Contracts, in their comment b to section 259, state the proposition in this manner: "In an action on a promise stated in absolute terms, but followed by the further statement that the duty will be terminated if a certain contingency occurs, the form of statement may have the effect of throwing the burden of pleading or of proof on the defendant, whereas the plaintiff must ordinarily plead and prove the happening of conditions precedent." (P. 371.)

court poses the main issue as being whether it was incumbent upon the buyer to prove facts constituting reasonable grounds for dissatisfaction with the investment. The court appears to assume that the burden went that way whether a personal judgment test or a reasonable man test was utilized. However, in a sense, the buyer in *Van Demark* was seeking to enforce a provision of the contract—a promise on the part of the seller to buy the property back if its economic productivity was unsatisfactory.

However, we feel that (as did both parties at the outset of this appeal) the clause in question set up a true condition precedent, one upon which the Kadners' total[21] duty of performance depended. There was not a statement of an absolute promise followed by a further statement that the duty was terminable on the occurrence of a contingency.

Despite the seeming plausibility of the considerations put forward by Shields, we feel that the strength of the authorities is supportive of the rule that in condition precedent cases the burden of persuasion as to such conditions lies on the party who seeks to enforce the contract not only as a concomitant of a pleading requirement, but intrinsically as well. (Code Civ. Proc., § 457; *Daum* v. *Superior Court,* 228 Cal.App.2d 283, 287 [39 Cal.Rptr. 443]; *Byrne* v. *Harvey,* 211 Cal.App.2d 92 [27 Cal.Rptr. 110]; Evid. Code, § 500; 5 Williston on Contracts, *supra,* § 674, p. 181; 3A Corbin on Contracts, *supra,* § 749, p. 468; Rest., Contracts, § 259, p. 371; *Inman Mfg. Co.* v. *American Cereal Co., supra,* 133 Iowa 71 [110 N.W. 287, 291]; *Ard Dr. Pepper Bottling Co.* v. *Dr. Pepper Co., supra* (5th Cir. 1953) 202 F.2d 372.)[22]

We do feel however that it is not inappropriate for the burden of going

---

[21]Shields suggests that the satisfaction condition related to only part of the Kadners' promise ("was not as wide as the promise") and so came under the second portion of the paragraph from section 674 of 5 Williston on Contracts, *supra,* at page 183, herinafter quoted. We think it applied to the Kadners' full duty of performance, and we do not agree with Shields' thought that because the condition related to duty of performance rather than existence of the contract, it "only affected part of the contract, was not as wide as the promise." The Williston paragraph is as follows: "In the case of a qualified promise, that is, where the exception would defeat the whole promise, a plaintiff cannot make out a prima facie case unless he alleges the promise and negatives the exception as of old, whereas, if the promise is simply subject to some exceptions, it is sufficient for the plaintiff to bring himself within the general terms of the promise, leaving it to the defendant to allege and prove that the plaintiff's claim in fact falls within an excluded exceptional class."

[22]Thus Shields has the burden to persuade the trial court (1) that the Kadners approved the Home encumbrance in writing or (2) that the Kadners eliminated the condition precedent by failing to approve the Home promissory note when it was more probable than not that any and all reasonable persons would have approved it. In other words, Shields has to prove that he had furnished a form of first encumbrance which would be acceptable to a reasonable man in the same circumstances as the Kadners.

forward (but not the ultimate burden of proof) to be shifted to the Kadners upon a Shields' prima facie showing of unreasonableness of dissatisfaction, giving to such a prima facie showing the same leverage as Williston says (quoting *Benanti* v. *Delaware Ins. Co.,* 86 Conn. 15 [84 A. 109]) is accorded a presumption available to insureds in insurance loss cases.[23]

It must be conceded that Shields failed to pursue the opportunity he had of presenting evidence to the trial court as to the general practice of loan companies in order to bolster his claim that the Kadners acted unreasonably. He might have been able to show that there was a universality of use of equivalent clauses, and that banks and loan associations were adamant against any liberalization of their standard forms and provisions. So, the position of Shields is not as strong as it might have been. Nonetheless, we feel that there is sufficient material in the record to have made it a question of fact for resolution by the trial court.

■ We set out some of the factors which we believe stand as evidence of substance indicative of an unreasonable move on the part of the Kadners.[24]

We feel that the reasonable man should not have expected that the Home promissory note would be free of default-acceleration and prepayment-penalty clauses. Such a man would have anticipated clauses of some kind on these common subjects. We note that the Kadners did not include in their notice an objection to the clause giving Home the option to accelerate in the event of sale of the property, so presumably they had, and certainly the reasonable man would have had no feeling that this was unusual.[25] If this is not unreasonable, there is a good basis for saying that

---

[23]"As to all conditions precedent the plaintiff sustains the burden of proof. [Footnote omitted.] Because of the practical inconvenience of compelling proof of all the conditions precedent in a policy of insurance, the plaintiff under our rule may, upon proof of his interest, the issuance of the policy to him, the loss, and compliance with the proofs of loss, rest upon the legal presumption that these conditions are prima facie established and the case made out. Thereupon the defendant may offer its proof of the several breaches which it may have pleaded, and these the plaintiff may in turn rebut. This burden of proof never shifts. Upon the whole evidence it is where it was at the beginning, upon the plaintiff, to prove his compliance with the terms and conditions precedent of the policy." (5 Williston on Contracts (3d ed.) § 674, p. 181.)

[24]The Kadners have pointed to the circumstance that Shields, in his cross-complaint, pleaded that the Kadners had acted in bad faith. The fact that he did so did not mean that he had acquiesced in that standard and was barred from asserting that the other applied and that the evidence showed unreasonable conduct.

[25]The Kadners made no objection to the seeming fact that a prepayment-interest penalty would be due in case Home required acceleration in the event of sale, indicating the outlook that such would be reasonable. Such a failure is incompatible with an objection to such a penalty with quarter payments in excess of 20 percent of the face of the note, suggesting that an objection in that regard would be unreasonable.

the default-acceleration clause is not unreasonable. It is also noted that the Challette Drive residence transaction had a promissory note containing such an acceleration clause.

As to the prepayment-penalty clause, we observe that a provision was inserted in the escrow instructions relative to the second promissory note to Shields that said note should contain a clause reserving the privilege of paying the whole or any part of the note prior to maturity. In addition, Dr. Kadner made it known that his wife's Barrington property, which, incidentally, was sold before the Cole Place escrow papers were signed, had financing with a prepayment-penalty clause in it.[26] Again, the Challette Drive residence transaction promissory note had a prepayment-penalty clause.

It is noted that Shields asked for a special finding on whether the prepayment-penalty and default-acceleration clauses (designated in the Kadner notice as disapproved) were reasonable.[27] The substance of the material mentioned above would have warranted some type of finding on this subject as related to the reasonable man test. The effect of this circumstance, at least, would be to prevent this court from considering an implied finding that the disapproved terms of the Home promissory note were unusual or were not to be expected by a reasonably minded person.

As noted above, the promissory note and first deed of trust which the Kadners assumed in connection with their ultimate purchase of the Challette Drive property had the same clauses in them to which the Kadners had made objection in their deal with Shields. Thus, it would appear that the objection was not to the intrinsic purport of the provisions but to differences as to their potential effect in the deal which had the somewhat larger monthly payment and total balance due. ($851/$747; $122,000/$110,000.[28]) Whether this would be a reasonable basis for objection re-

However, there is the legal possibility (which is unnecessary for us to evaluate) that if Home exercised its option for acceleration in event of sale, it could not extract the interest penalty.

[26]Dr. Kadner indicated that the penalty provided for was higher than he thought it would be. (On the matter of the amount of penalty, see *infra.*)

[27]The request also was for a special finding that such clauses were usually contained in similar promissory notes and deeds of trust. This part of the request was denied, perhaps on the basis that no expert proof had been presented on the subject and that no request for taking judicial notice (Evid. Code, § § 452, subd. (g) and 453) had been made. This would appear to be an area wherein the process of taking judicial notice at the appellate level would be permissible, but that we have not indicated an intention to engage in the process, as would be the proper thing to do under sections 459, subdivision (c) and 455, subdivision (a) of the Evidence Code, because other factors in the record make it unnecessary.

[28]The $851 monthly payment, the $122,000 unpaid balance and the $124,000 original amount of the Home promissory note were known terms of that note, and,

quires some analysis. The prepayment clause would not go into effect unless the Kadners desired, in the course of retaining and purchasing the house, to pay more than 20 percent of the original amount of the note ($124,000) in any calendar quarter. On the mentioned premise, this was not a particularly stern clause. The Kadners could pay the entire amount off in five quarters without penalty. The difference, in this respect, between the two transactions (Cole Place-Challette Drive) was not of great moment. The unpaid balance on the Cole Place transaction was about $122,000; the unpaid balance on the Challette Drive property was about $110,000.

The alternate concern as to the prepayment.clause would be with respect to what would have to be considered an unanticipated sale of the property by the Kadners due to an unexpected change in their financial status if, in such a sale, Home would not be willing to have the buyer assume the payment of the obligation owing to it secured by the property. In such event, 130 days' interest on the original amount of the note would have to be paid as penalty and such burden likely would fall upon the Kadners as sellers. However, the same situation would apply as to the Challette Drive property, the only difference being that the Kadners might better be able to handle the Challette property despite financial reverses because the monthly payments were lesser and they might have been able to maintain a reserve[29] to meet such contingencies because the down payment was not so substantial. However, it must be borne in mind that this circumstance was due to the monetary elements of the transaction and not to the prepayment clause. What the Kadners were concerned about was the hazard of being in a financial position which would not permit their retention of the property. In either case, once a decision had to be made to sell the property, the prepayment problem which would follow would not be substantially different and could hardly be a determinative factor. The same, of course, applies to the acceleration clause to which objection was made. The concern was the hazard of going into default. It would be easier to go into default with respect to the Cole Place property than with respect to the Challette Drive property. Once a default occurred in either instance, if Home elected to accelerate and to apply the 2 percent raise in interest on the total delinquency for as long as it continued, both deals would have presented a fundamental problem to the Kadners.[30] We con-

of course, were not the subject of specific objection. As indicated previously, there apparently was a second promissory note and deed of trust in the Challette Drive deal in the amount of $10,000 or $15,000.

[29]Dr. Kadner made the point that he did not object to the clauses in the Challette Drive transaction because he would have a cash reserve.

[30]Incidentally, Dr. Kadner seemed to think that the acceleration clause was to be construed as allowing the interest rate to go up 2 percent permanently if Home did

clude that this factor, which must be considered an important one from the Kadners' point of view, should not have supported the Kadners disapproval of the indicated clauses under the reasonable man test.

In using the reasonable man gauge in this respect, perhaps it would be appropriate for the traditional person to be cast generally in the financial status of the true party involved. The Kadners face a difficulty here. Little was presented by them to show their true financial picture. We learned nothing of Dr. Kadner's professional income. The doctor did speak of having tax problems and being currently in a tight financial status; but no details were given, and, actually, there was an indication of the doctor having investments in securities and of his wife having independent means. The lack of proof in this area would require any evaluation which might seem to turn on a variation of the financial position of the Kadners to be weighted on the side of the Shields.

Further, it would seem that the reasonable man would have been willing to give Shields a chance to get a modification from Home or to refinance the Cole Place residence at his own cost.[31] (See *San Bernardino Valley Water Dev. Co. v. San Bernardino Valley Mun. Water Dist.,* 236 Cal.App. 2d 238, 257-258 [45 Cal.Rptr. 793].)

Finally, the fact that the trial court made a specific finding[32] on the issue of good faith indicates that it felt that the Kadner action was unreasonable, though not in bad faith; otherwise, there was no need to find on good faith because if the action was reasonable it met both tests. How-

---

not insist on acceleration. This is not correct. As we see it, the 2 percent increase applied only to the total amount when acceleration was elected.

[31]The Kadners argue in their brief that they had no duty to look for additional financing or to request that the defendant obtain different financing, citing *JMR, Inc. v. Hedderly,* 261 Cal.App.2d 144 [67 Cal.Rptr. 742] (which does not seem to be pertinent). This is not to say, however, that they did not owe a duty, as indicated in the *San Bernardino Valley Water Dev. Co.* case, *supra,* to give Shields a chance to obtain different financing or to get Home to make a modification.

[32]While on the subject of the findings, we note that commencing with finding 9 and continuing through 37, each finding is made by stating that certain paragraphs in certain causes of action, in answers to certain causes of action in certain affirmative defenses, or in the fourth amended cross-complaint, or in answers thereto are true or untrue with certain exceptions. This method of making findings, pursued by the Kadners and accepted by the trial court, although then not governed by the Rules of Court, is unsatisfactory. (See Code Civ. Proc., § 632 and Cal. Rules of Court, rule 232(e), effective January 1, 1969.) We have not been furnished in the Kadners' brief with references to any of these particular findings and explanations of what they amount to. We have not assumed the tedious task of analyzing and tabulating what they mean. We assume they are superfluous and do not assist the Kadners beyond what the specific findings state. (See 4 Witkin, Cal. Procedure (2d ed. 1970) Trial, § 322, pp. 3125-3126; § 334, pp. 3135-3137.)

ever, we do not believe that the trial court, in light of its turn to the personal judgment test, produced this finding with this connotation by any deliberate evaluation of the few factors in the case relating to the reasonableness of the Kadners disapproving action. Consequently, we do not hold that the trial court has already made a dispositive finding of unreasonableness thus requiring an appellate "merits" decision in favor of Shields.

 At trial, the Kadners made the additional contention supported by the second part of their notice in effect giving cause for rescission, that Shields had made fraudulent representations concerning the limited extent to which the Home promissory note of $124,000 had been reduced, which affected the amount of the down payment which the Kadners would have to make. It does not appear that this claim is carried forward in the appeal. However, it seems appropriate to respond briefly to it. The trial court found against it, and its position is well supported. The deposit receipt spoke of approximately $124,000. Dr. Kadner recalled that Shields had told him and his wife on April 27, 1966 (when the deposit receipt was signed), and in early May that payments were being made on the first trust deed. The Kadners conceded seeing a "flyer" about the property in January 1966. The "flyer," which came into evidence as an exhibit,[33] under the heading of "Financing," specifies: " Loan $124,000 Home Savings Payable $851 per mo." The trial court observed that it considered the resulting monetary differential ($1,204.30) insignificant, which must have meant insignificant to the Kadners under its analysis of their financial picture. It also commented that, anyway, there was some dispute about even this amount. Part of the $1,204.30 differential reasonably should have been envisioned by the Kadners. In actuality, the note provided that the monthly payments of $851 started August 5, 1965. However, the record does not indicate that that fact was communicated to the Kadners until they received a copy of the Home promissory note on May 2, 1966. However, at the time of negotiations they reasonably should have figured payments running from about February 1966, making a period of about four months. Calculations would have shown that this meant about $434 off principal. So, the Kadners should have been surprised about only $770. This may have been what the trial court had in mind when it said, with respect to the $1,204.30 differential, that there was some dispute about it anyway. The remark suggests that the trial court was not convinced by a preponderance of the evidence that the Kadners were surprised by the entire $1,204.30. Incidentally, Dr. Kadner testified that he could not honestly say that he would not have entered the agreement if he had known at the time that the unpaid balance on the Home promissory note was $1,200 less than

[33]Plaintiffs' No. 5.

the $124,000. We also note that the deposit receipt which the Kadners executed contained a clause saying that neither broker, agent or salesman, warrants representations made concerning the real property to be true. The circumstances above reviewed certainly foreclosed any possibility of a trial court finding of misrepresentation; and, of course, there was none.

Finally, Shields contends that the Kadners should not have been allowed interest on the $10,000 escrow deposit from the date of Shields' letter to the bank instructing it not to honor the Kadners' request for a return of the fund. Unquestionably, the instruction from Shields influenced the action of the bank. It must be said that Shields took his chances that his position would turn out to be correct.

However, Shields' alternatives should be examined. He could have concluded (with a legal prescience seldom the asset or even the desire of individuals so beset as Shields) that the Kadners were probably right and advised the bank that it acquiesced in the Kadners' request. He still could have contested the issue of the right of the Kadners to withdraw from the contract but would be losing what, in effect, was the equivalent of an attachment. Such a move would have forestalled the accrual of interest.

On the other hand, Shields could have made no communication whatsoever to the bank. He might now contend, with some force, that, under such hypothesized circumstances, the bank would have done the same thing and that, therefore (on the basis of nonaction, or, looking at it another way, of failure to acquiesce), he should not be made liable for interest. No one from the bank was queried as to whether it would have withheld the fund under such circumstances. We feel that it was more the responsibility of Shields than of the Kadners to make inquiry on this point, and that Shields, for his failure, should reap the adverse inference that the bank would have returned the Kadners' deposit to them in face of the notice from the Kadners and no word from Shields.

There is the additional angle that the Kadners could have sought Shields' agreement to have the escrow fund placed in an interest-earning savings account or term deposit. This seems reasonable, but the question is as to when it should be considered that the Kadners should have made such a proposal and at what time Shields likely would have accepted it. We feel that this would be, at least, at the occasion when the stipulation was made between the parties that the bank should be dismissed from the lawsuit, hold the fund and await instructions as to its disbursal (May 7, 1969). It is entirely possible that this was done and was not indicated in the record. If it has been, the situation will take care of itself. It is open to question whether any earlier occasion should be considered as such a time. The

trial court can take judicial notice as to what interest the fund could have drawn under such circumstances and whether, at least as to a term deposit interest, would compound the second year. We are of the opinion however that the interest on any award should be straight and not compounded. Thus, if the Kadners are successful in a retrial, interest should be awarded at the rate of 7 percent per annum from the date of Shields' notice to the date of the stipulation, and thereafter at a reduced rate as determined by the trial court. Of course, in dealing with this question of interest, we, in no way, intend to indicate a view as to how the retrial should come out under the reasonable man test, whether new and additional evidence comes in (which is quite likely) or not.

Of course, Shields could have proposed the allocation of the fund to an interest-bearing account. It might be said that he should bear the brunt of his lack of alertness in this respect, and that there should be no diminution of interest as suggested. However, we feel that we should resolve the conflicting postulates against the Kadners on the theory that they had the duty to mitigate damages.

The judgment is reversed.

Kaus, P. J., and Aiso, J., concurred.

A petition for a rehearing was denied October 14, 1971, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied November 18, 1971.