AMFAC, INC., a Hawaii corporation, Plaintiff, Counterdefendant–Appellee, Cross–Appellant, v. **WAIKIKI BEACHCOMBER INVESTMENT COMPANY**, a Hawaii general partnership, Defendant, Counterclaimant–Appellant, Cross–Appellee, and **WAIKIKI BEACHCOMBER**, a Hawaii joint venture, **ISLAND HOLIDAYS, LTD.**, a Hawaii corporation, and **WAICOMBER CORPORATION**, a Hawaii corporation, Additional Counterdefendants–Appellees, Cross–Appellants

NO. 15053

(CIV. NO. 87–1659–05)

OCTOBER 14, 1992

LUM, C.J., MOON, AND LEVINSON, JJ., RETIRED JUSTICE HAYASHI, IN PLACE OF ASSOCIATE JUSTICE WAKATSUKI, DECEASED, AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF KLEIN J., RECUSED

## OPINION OF THE COURT BY LEVINSON, J.

The defendant, counterclaimant–appellant, cross–appellee Waikiki Beachcomber Investment Company (WBIC)[1] appeals the trial court's findings of fact (FOFs), conclusions of law (COLs), and final judgment entered on November 8, 1990. WBIC contends that the trial court erred in not awarding WBIC all of its claimed damages and prejudgment interest arising out of an alleged breach by the plaintiff, counterdefendant–appellant, cross–appellee Amfac, Inc. (Amfac)[2] of an indemnification agreement. Amfac cross–appeals the circuit court's September 30, 1988 order granting partial summary judgment in favor of WBIC, ruling as a matter of law that Amfac had breached the indemnification agreement.

---

[1] At all relevant times, WBIC was a general real estate investment partnership comprised of James Reynolds (Reynolds) and Jay Shidler.

[2] Waicomber Corp., Island Holidays, Ltd., and Waikiki Beachcomber—joint venture partners of Amfac—were additional counter-defendants–appellees, cross–appellants. They are all collectively referred to in this opinion as "Amfac."

Amfac also cross–appeals the circuit court's November 3, 1988 order denying Amfac's motion for reconsideration of the summary judgment order and the trial court's November 8, 1990 FOFs, COLs, and final judgment.

For the reasons set forth in this opinion, we affirm the circuit court's orders, vacate the trial court's final judgment, and remand for a determination of damages and attorney's fees consistent with this opinion.

## I. **Background**

The present case involves three Land Court registered parcels located in the Waikiki district of Honolulu. The first, Lot 30–A, fronts Kuhio Avenue; the Coral Reef Hotel is located on it. The second, Lot 54, fronts Kalakaua Avenue; the Waikiki Beachcomber Hotel (WBH) is located on it. The third, Lot 29, is situated between Lots 30–A and 54, and the International Market Place is located on it. At all relevant times, the fee simple owner of the three lots was the Queen Emma Foundation, also known as the Queen's Medical Center (Queen's). The master lessee–sublessor of the lots was Waikiki Development Co., Inc., also known as WDC Venture (WDC). From and after April 1, 1974, Andre Stephen Tatibouet, William W. Saunders (Saunders), Annalie Knaack Tatibouet, Martin Von Dehn McCall and Stephanie Tatibouet McCall (collectively the Group), were the sublessees of Lot 30–A and owned the Coral Reef Hotel. From March 11, 1969 through January 31, 1985, Amfac was the owner of the WBH and the sublessee of Lot 54.

In 1956, in conjunction with the Land Court registration of various lots, including Lots 29 and 30–A, Easement H, also known as "Duke's Lane," was created and ran from

Kuhio Avenue to Lot 4 across the ewa (west) side of Lots 29, 30–A, and 25. Easement H was a twenty–foot wide nonexclusive easement for roadway purposes to be used in common by the owners/lessees/sublessees of Lots 30–A, 29, 4, and 25; it allowed ingress and egress to and from Kuhio Avenue. In 1969, Lots 4 and 25 became part of Lot 54, and the easement rights associated with Easement H passed to the owners/lessees/sublessees of Lot 54. Additionally, from and after 1968, an easement was created *in favor of Lot 29 only and against Lot 30–A* "for the construction, repair and operation of sewers and other underground utilities along and under Easement H." In connection with this easement, WDC caused a sewer line to be placed for servicing the International Market Place.

Pursuant to yet another easement subject to a relocation clause granted by Consolidated Amusement Co., Ltd. (Consolidated) to the owners/lessees/sublessees of Lot 54, the WBH had been serviced by a sewer line that ran ewa to Seaside Avenue over adjacent property owned by Consolidated. In late 1979 or early 1980, Consolidated notified Amfac that it was exercising the relocation clause. Amfac obtained an oral right of entry from Queen's and WDC for the construction of the WBH's new sewer line under Easement H. *However, Amfac did not seek or obtain consent from the Group for construction of the WBH's sewer line under Easement H and across Lot 30–A.*

Amfac constructed the new WBH sewer line to run from the ewa–mauka (northwest) corner of Lot 54 under Easement H and across the ewa edges of Lots 29 and 30–A, tying into the municipal sewer line on Kuhio Avenue. Before the WBH sewer line was completed, Saunders, on behalf of the Group, notified Amfac and WDC in a letter dated September 9, 1980 that no sewer easement rights existed in favor of the owners/lessees of Lot 54, over

and across Lot 30–A along Easement H.[3] The letter stated in relevant part:

Although we are receptive to negotiating the terms of such an easement, contingent of course upon approval of WDC Venture, as Sublessor, and The Queen Emma Foundation, as Lessor, such negotiations would *include at least a clarification of all easement rights and obligations regarding the access easements running between Kalakaua and Kuhio Avenues and a reasonable allocation of maintenance costs. Further some study should be given to a possible allocation of present and/or future lease rentals among the users of the easements in proportion to their respective usages thereof.*

By this letter, *we urge that an immediate review of these matters be made since it presently appears to us that the sewer construction is proceeding without sewer easement rights* and, of course, if that proves to be true, *such construction work is being done at the peril of the Waikiki Beachcomber Hotel in the unlikely event we are unable to reach a mutually satisfactory agreement* on all such issues. *Perhaps*, therefore, *the Waikiki Beachcomber Hotel should suspend any further*

---

[3] WDC maintained that it had an easement for "construction, repair and operation of sewers and other underground utilities" along and under Easement H in favor of Lot 29 and that it had had this easement for forty years. WDC expressed the view that the new WBH sewer line had replaced its old sewer line for which it had easement rights.

> *construction activities pending such agreement* . . . .

(Emphasis added.)

Amfac's response to the letter was that "it would look into it and get back to him [Saunders]." To ascertain whether Amfac had any existing sewer easement rights as to Easement H, Amfac sought advice from outside counsel, who responded, *inter alia*, in a letter dated October 3, 1980:

> At the present time the . . . *[WBH] does not have a formal written agreement from* . . . *Queen's* . . . *or WDC* . . . *authorizing it to use Easement H for sewer line purposes.* We recommend that such an agreement be prepared and entered into by and among those parties and Amfac, Inc. The document could be styled as a partial assignment or sublease of the reserved sewer line easement rights. *Amfac may be requested to indemnify these parties against the claims of* . . . *[the Group]* and this could also be included in the instrument.

(Emphasis added.)

In December 1980, Amfac requested that Title Guaranty of Hawaii, Inc. (TGH) conduct a title search of Lot 30–A to determine whether a sewer easement running in favor of Lot 54 across Lot 30–A existed; the search revealed that *there was no such easement.* In March 1981, Amfac directed outside counsel to prepare a "Grant of Nonexclusive Easement" to be signed by Queen's, WDC, and the Group. However, none of these parties signed the document and *Amfac took no further action in securing a valid easement for its sewer line.*

On or about May 4, 1984, WBIC and Amfac entered into a purchase agreement (the WBIC Purchase Agreement) for the sale of the WBH and Amfac's subleasehold interest in Lot 54 (the WBIC Purchase). Amfac's representatives regarding the WBIC Purchase Agreement were George Fujikawa (Fujikawa) and in-house counsel Carl Tom (Tom). WBIC's representatives were James Reynolds (Reynolds) and outside counsel, Melvin Kaneshige (Kaneshige). The WBIC Purchase Agreement was mutually drafted by the parties' respective counsel and the closing date of the sale was set for January 31, 1985. Approximately five months before the closing date for the purchase, WBIC learned that no sewer easement existed in favor of Lot 54 for the WBH's sewer line. On November 27, 1984, Amfac again directed TGH to do a title search, this time for Lot 54, to determine if any sewer easement existed; *no sewer easement existed.*

Thereafter, both Amfac and WBIC met with Saunders to try to reach an agreement whereby the Group would grant Lot 54 a sewer easement across Lot 30–A for little or no consideration; no agreement was reached. On January 30, 1985, Kaneshige suggested that the sewer easement problem could be taken care of to the satisfaction of WBIC if Amfac, as the new owner of the WBH, would agree to indemnify WBIC against any claims made against WBIC as a result of the absence of any recorded sewer easement. Kaneshige drafted a preliminary Indemnification Agreement, which precipitated negotiations between Kaneshige and Tom. On January 31, 1985, the Indemnification Agreement was signed by both parties, and WBIC's purchase of Amfac's subleasehold interest in Lot 54 and of the WBH closed on time.

The Indemnification Agreement provided in relevant part:

1. **Indemnity**. *[Amfac] will indemnify and hold WBIC harmless from and against any and all claims*, demands, judgments or causes of action arising out of or *in any way related to* the encroachments onto the [WBH] property and the location, placement, construction, maintenance, repair or replacement of *a sewer line* or lines *under* the roadway in an area commonly known as *"Duke's Lane"* located along the ewa boundary of the [WBH] and running from Kalakaua Avenue to Kuhio Avenue, *including, without limitation, claims arising because of the failure to secure a sewer easement prior to* the *construction* of a sewer line along Duke's Lane *and claims for contribution towards the costs of maintenance of the sewer line* and Duke's Lane.

2. **Sewer Easement and Encroachments**.

(a) *[Amfac] will obtain and file of record a sewer easement (in form and content reasonably satisfactory to WBIC) granting to the owners/lessees/sublessees of the [WBH] property an easement under Duke's Lane for sewer purposes* and will, if reasonably required by WBIC, cause the removal of said encroachments onto the [WBH] property. *Any and all costs in connection with such grant* and removal of such encroachments, *including reasonable attorneys fees of WBIC, shall be borne by [Amfac], not WBIC.*

(b) *There shall be no continuing obligation on the part of any fee simple owner, lessee, sublessee or any person with an interest in the*

> *[WBH] property (except for [Amfac]) to pay any amounts, either lump sum or in installments, for the grant of such easement* or removal of such encroachments.

(Emphasis added.)

Between January 31, 1985 and June 21, 1985, Fujikawa investigated the possibility of building an alternative sewer line for the WBH out to Kalakaua Avenue; Amfac subsequently concluded that building such an alternative sewer line was not economically feasible. Because of Amfac's difficulty in obtaining the Group's consent to the grant of a sewer easement in favor of Lot 54 across Lot 30–A without paying monies considered "unreasonable" by Amfac, Fujikawa advised Reynolds that an alternative means of satisfying Amfac's obligations under the Indemnification Agreement would have to be found. WBIC's counsel, Edward Chun (Chun), drafted a letter dated April 15, 1985 (the Letter Agreement) in conjunction with Amfac's counsel, Lynn Hiatt. The Letter Agreement provided, *inter alia*, that Amfac's obligations under the Indemnification Agreement would terminate if either of two conditions were satisfied:

> Additionally, WBIC hereby agrees that *the Indemnification Agreement provisions relating to the sewer line* referred to on page 1 of this letter *shall terminate upon* the earlier of:
>
> > (1) the execution by [the Group] of an instrument unconditionally acknowledging said sewer easement; or
> >
> > (2) *verification by [TGH] (to WBIC's reasonable satisfaction) that the subleasehold interest in Lot 30–A* held by [the Group] *is subject to a pre–*

*existing sewer easement in favor of Lot 54.*

(Emphasis added.) The Letter Agreement was signed by Amfac on May 3, 1985; in it, Amfac not only agreed to the two alternative means of performance, but also reaffirmed its continued obligations under the Indemnification Agreement. WBIC insisted on Amfac's reaffirmation of its indemnity obligations because the Group had declined to become a party to a "Grant of Nonexclusive Easement," which was executed by Queen's and WDC in favor of WBIC and subsequently recorded in Land Court on June 27, 1985.

Pursuant to the WBIC Purchase Agreement, Amfac was obligated to deliver an estoppel certificate from WDC to WBIC. However, WDC refused to execute the estoppel certificate as long as the sewer easement problem remained unresolved with the Group. WBIC needed the estoppel certificate because an ALTA mortgagee's title policy, a requirement imposed by WBIC's lender in connection with the financing of the WBIC Purchase Agreement, would not be issued until the sewer easement problem was rectified. Accordingly, in consideration for Amfac's agreement to indemnify TGH against any loss, Amfac induced TGH to issue an ALTA mortgagee's title policy that did not disclose the absence of a recorded sewer easement granted by the Group in favor of Lot 54. TGH's "false" policy satisfied WBIC's lender, and WBIC obtained the necessary funding to discharge its financial obligation to Amfac under the WBIC Purchase Agreement.

Thereafter, until 1987, Amfac took no further action to secure the Group's consent to a sewer easement in favor of Lot 54. In December 1986, WBIC entered into negotiations to sell the subleasehold interest in Lot 54 and the WBH to Azabu, U.S.A. Corporation (Azabu). On January

2, 1987, the parties executed a purchase agreement (the Azabu Purchase Agreement) for the sale of the sub-leasehold interest in Lot 54 and the WBH to Azabu. By a first amendment to the Azabu Purchase Agreement, dated February 5, 1987, the closing date for the sale was set for April 30, 1987. One of WBIC's pre–closing obli-gations was to cause TGH to issue an ALTA owner's title policy to Azabu for Lot 54. Sometime during mid–April 1987, TGH refused to issue an ALTA owner's title policy verifying the existence of a sewer easement in favor of Lot 54 without first receiving complete indemnities from Amfac and WBIC. It was only then that WBIC discovered that Amfac had not yet obtained the easement grant from the Group and therefore that the easement did not in fact exist.

On or about April 16, 1987, WBIC advised Azabu and Amfac of the continuing existence of the sewer easement problem, and on several occasions all three parties met to discuss possible solutions. On April 24, 1987, Azabu advised WBIC that it would not close the sale without a recorded sewer easement from the Group and that it would not extend the April 30, 1987 closing date. WBIC met with Saunders to discuss what the Group wanted in exchange for granting Lot 54 a sewer easement. Later that day, Reynolds personally contacted Saunders and offered $50,000.00 as reasonable compensation for the Group's granting the sewer easement. Saunders refused to compromise his previous demands, whereupon WBIC drafted an agreement (the Joinder Agreement) to secure the Group's joinder in the existing "Grant of Nonexclusive Easement."

In a letter dated April 27, 1987, WBIC tendered the Joinder Agreement to Amfac; two days later, Amfac rejected the Joinder Agreement. Instead, as a means of

satisfying its obligations under the Indemnification Agreement, Amfac secured and tendered to WBIC a commitment from TGH to issue the same form of ALTA policy as it had previously provided to WBIC's mortgagee, i.e., a "false" ALTA title policy that would "verify" the pre–existence of an easement in favor of Lot 54. WBIC rejected Amfac's tender of title "verification" because, in fact, no pre–existing sewer easement had been granted by the Group. Thereafter, WBIC, Azabu, and the Group executed the Joinder Agreement, by the terms of which the Group granted the sewer easement in consideration of WBIC's agreement to pay the Group the sum of $200,000.00 and to assume fourteen percent of the Group's future lease rent and real property tax obligations with respect to Lot 30–A through the year 2050.

On May 15, 1987, Amfac filed a complaint for declaratory judgment against WBIC, seeking a declaration that Amfac had satisfied all of its obligations to WBIC under the Indemnification Agreement as of April 29, 1987—the date Amfac tendered TGH's commitment to issue an ALTA owner's title policy "verifying" the pre–existence of a recorded sewer easement in favor of Lot 54. In its answer and counterclaim, WBIC alleged that Amfac had breached its obligations under the Indemnification Agreement and that WBIC was entitled to damages resulting from the alleged breach. On cross–motions for summary judgment, the circuit court entered partial summary judgment in favor of WBIC, ruling as a matter of law that Amfac had breached its obligations to WBIC under the Indemnification Agreement. Thereafter, and further to the circuit court's order granting partial summary judgment, WBIC filed a motion, in the nature of partial summary judgment, for determination of damages; the circuit court denied the motion because there was a genuine

issue of material fact as to the amount of WBIC's damages. After a bench trial on the issue of damages, the trial court entered judgment in WBIC's favor in the amount of $305,163.84, consisting of $200,000.00 in damages by reason of Amfac's breach of the Indemnification Agreement and $105,163.84 for reasonable attorney's fees and costs. WBIC timely appealed and Amfac cross–appealed.

## II. **Discussion**
### A. **Summary Judgment**

Amfac claims that it satisfactorily complied with the second condition of the Letter Agreement when, by letter dated April 29, 1987, it tendered to WBIC TGH's commitment to issue an ALTA owner's title policy "verifying" the pre–existence of a sewer easement across Lot 30–A in favor of Lot 54.[4] Amfac contends that, based on the parties' understanding at the time the Letter Agreement was executed, the issuance of an ALTA policy should have constituted reasonably satisfactory "verification" by TGH of a pre–existing sewer easement and, therefore, Amfac's obligations under the Indemnification and Letter Agreements should be deemed to have terminated.

WBIC argues that Amfac partially satisfied its obligations under the Indemnification and Letter Agreements when WBIC obtained and recorded the June 21, 1985 "Grant of Nonexclusive Easement" from Queen's and WDC. According to WBIC, Amfac's tender of TGH's commitment to issue an ALTA policy as "verification" of a

---

[4] In oral argument on the cross–motions for summary judgment, both sides agreed that the question whether Amfac had or had not performed as required under the Indemnification and Letter Agreements "boiled down to" the circuit court's interpretation of the Letter Agreement and, in particular, the second condition.

pre–existing sewer easement was not "reasonably satis-factory" performance of the second condition of the Letter Agreement because the uncontroverted fact was that the Group's subleasehold interest in Lot 30–A was never subject to any pre–existing sewer easement running in favor of Lot 54. WBIC contends that the only reason TGH was willing to issue a ALTA policy "verifying" the pre–existence of a sewer easement was that Amfac had agreed to indemnify TGH; thus, TGH was "verifying" the existence of something that did not in fact exist.

We review an award of summary judgment under the same standard applied by the circuit court. *Gossinger v. Association of Apartment Owners of The Regency Ala Wai*, 73 Haw. 412, 417, 835 P.2d 627, 630 (1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gossinger*, 73 Haw. at 417, 835 P.2d at 630 (citing Hawaii Rules of Civil Procedure (HRCP) 56(c) (1990)).

In its September 30, 1988 order granting WBIC's motion for partial summary judgment, the circuit court ruled:

[TGH's] commitment to issue an [ALTA] policy in favor of Azabu effective April 30, 1987, including the sewer easement across and under Lot 30–A and in favor of Lot 54 *did not reasonably satisfy . . . [WBIC], because there never was a pre–existing easement. The policy could not verify what in fact never existed* and, therefore, Condition #2 of the [Letter Agreement] was not satisfied by . . . [Amfac].

(Emphasis added.) The determination as to whether the circuit court was correct in granting summary judgment in favor of WBIC turns on the meaning of the phrase "reasonable satisfaction" as it appears in the Letter Agreement.

Although there is no Hawaii authority construing when a contracting party should be "reasonably satisfied" with a tendered performance, other jurisdictions have addressed the issue. The majority recognize that, when a contract provides for one party's performance to be rendered to the "satisfaction" of another, absent any express contract language modifying the term "satisfaction," there are two standards that can be applied to determine satisfaction: the "objective reasonable satisfaction" standard and the "subjective personal satisfaction" standard. *See, e.g., **Kadner v. Shields**,* 20 Cal. App. 3d 251, 259–62, 97 Cal. Rptr. 742, 748–51 (1971); ***Indiana Tri–City Plaza Bowl, Inc. v. Estate of Glueck**,* 422 N.E.2d 670, 675 (Ind. Ct. App. 1981).

Absent express language in the contract as to which standard to apply, the majority of jurisdictions apply the "objective reasonable satisfaction" standard when the contract involves commercial quality, operative fitness, or mechanical utility which knowledgeable persons are capable of judging; the "subjective personal satisfaction" standard is applied when the contract involves personal aesthetics, taste, or fancy. *See, e.g., **Kennedy Associates, Inc. v. Fischer**,* 667 P.2d 174, 181–82 (Alaska 1983); ***Meredith Corp. v. Design & Lithography Center, Inc.**,* 101 Idaho 391, 393, 614 P.2d 414, 416 (1980); ***Indiana Tri–City Plaza Bowl**,* 422 N.E.2d at 675; ***Fitzmaurice v. Van Vlaanderen Machine Co.**,* 57 N.J. 447, 449, 273 A.2d 561, 562 (1971); ***Cranetex, Inc. v. Precision Crane & Rigging, Inc.**,* 760 S.W.2d 298, 301–02

(Tex. Ct. App. 1988); *Haymore v. Levinson*, 8 Utah 2d 66, 68, 328 P.2d 307, 309 (1958).

However, in many cases, there is no clear demarcation between which of the two standards should be applied. In the absence of specific language in the contract or a clear indication from the nature of the subject matter of the contract, many jurisdictions opt for the less arbitrary objective reasonable satisfaction standard. *See, e.g., Kennedy*, 667 P.2d at 182; *Kadner*, 20 Cal. App. 3d at 263, 97 Cal. Rptr. at 752. Moreover, even where the contract has explicitly stated that satisfaction relates to "artistic effect," such language will not be enforced literally if the subject matter of the contract relates to commercial quality, operative fitness, or mechanical utility. *See Morin Bldg. Products Co. v. Baystone Construction, Inc.*, 717 F.2d 413, 416 (7th Cir. 1983) (applying Indiana law).

In the present case, not only did the Letter Agreement expressly provide for WBIC's "reasonable satisfaction" with respect to the second condition, but the subject matter did not involve personal aesthetics, taste, or fancy. Accordingly, we apply the "objective reasonable satisfaction" standard to the Letter Agreement in construing the meaning of the second condition. *See, e.g., Aztec Film Productions, Inc. v. Prescott Valley, Inc.*, 128 Ariz. 402, 406, 626 P.2d 132, 136 (1981) (where contract provided that "approval shall be given expeditiously and not unreasonably withheld," objective test of reasonableness applied); *Broad & Branford Place Corp. v. J.J. Hockenjos Co.*, 39 A.2d 80 (N.J. 1944) (objective reasonable satisfaction standard applied to lease covenant that provided that the landlord shall not "unreasonably" withhold consent to a tenant's subletting of the leased premises).

Under the objective reasonable satisfaction standard, "[s]atisfaction is said to have been received if a reasonable person in exactly the same circumstances would be satisfied." *Indiana Tri–City Plaza Bowl*, 422 N.E.2d at 675; *accord Broad & Branford Place Corp.*, 39 A.2d at 82 ("What would a reasonable man do in the like circumstances?"); *Meredith Corp.*, 101 Idaho at 393, 614 P.2d at 417 ("[T]he satisfaction requirement . . . must be determined by the standard of what a reasonable person in the same situation would find satisfactory.").

In *Broad & Branford Place Corp.*, the New Jersey Supreme Court recognized that:

> The term "reasonable" is relative and not readily definable. As here used, it connotes action according to the dictates of reason . . . such as is just, fair and suitable in the circumstances. And questions of reasonableness of conduct and good faith are ordinarily for the judgment of the triers of the facts.

39 A.2d at 82. Inasmuch as the term "reasonableness" is subject to differing interpretations (i.e., is "relative and not readily definable"), it is inherently ambiguous. Where ambiguity exists, summary judgment is usually inappropriate because "the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ." *Bishop Trust Co. v. Central Union Church*, 3 Haw. App. 624, 628–29, 656 P.2d 1353, 1356 (1983) (quoted in *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1145 (1984)). Thus, the determination of what would satisfy a reasonable person in exactly the same circumstances is similarly a question of fact often inappropriate for summary judgment.

However, "reasonableness" can constitute a question of law for the court "when the facts are undisputed and not fairly susceptible of divergent inferences" because "[w]here, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury." *Broad & Branford Place Corp.*, 39 A.2d at 82; *cf. Parker v. Nakaoka*, 68 Haw. 557, 562, 722 P.2d 1028, 1031 (1986) ("When the evidence is ·so clear that reasonable minds could only come to one conclusion, it is not error for the trial judge to remove the . . . question from the jury and to determine the question as a matter of law."); RESTATEMENT (SECOND) OF CONTRACTS § 212 cmt. e (1981) ("[A] question of interpretation is not left to the trier of fact where the evidence is so clear that no reasonable person would determine the issue in any way but one.").

Both parties agree that there was no pre–existing sewer easement in favor of Lot 54 at the time Amfac tendered TGH's commitment to issue an ALTA owner's title policy to Azabu in April 1987. Nevertheless, Amfac contends that, short of producing an executed Joinder Agreement, the tender of TGH's policy was the only available means of accomplishing the "verification" called for in the second condition of the Letter Agreement. Amfac's argument begs the question because the crux of the parties' dispute is precisely whether they could reasonably have intended, when they entered into the Letter Agreement, that a "false" ALTA policy could be *capable* of constituting "verification" of a non–existent easement. The term "verification" is unmodified in the Letter Agreement, and it is fundamental that "terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning." *SGM Partners v. The Profit Co.*, 8 Haw. App. 86, 123, 793 P.2d 1189, 1212 (citing *Maui Land &*

*Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 10, 674 P.2d 390, 394 (1984)), *rev'd in part on other grounds*, 71 Haw. 506, 795 P.2d 853 (1990).

"Verification" is defined as "evidence that establishes or confirms . . . accuracy or truth . . ." or "the process . . . required to prove or establish authenticity or validity." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1587 (1989). To "verify" means "[t]o prove to be true; to confirm or establish the truth or truthfulness of; to check or test the accuracy or exactness of; to confirm or establish the authenticity of; to authenticate . . . ." BLACK'S LAW DICTIONARY 1561 (6th ed. 1990); *see also Federal Insurance Co. v. Century Federal Sav. & Loan Ass'n*, 113 N.M. 162, 824 P.2d 302, 306 (1992) ("The term 'verify' requires the insured 'to confirm or substantiate . . . to prove to be true . . . [or] conclusively demonstrate . . . .' " (citation omitted.)) Because "[a] writing is interpreted as a whole and all writings forming a part of the same transaction are interpreted together[,]" *Anthony v. Hilo Electric Light Co.*, 50 Haw. 453, 457, 442 P.2d 64, 66–67 (1968) (quoting RESTATEMENT OF CONTRACTS § 235(c) (1932)), the Indemnification and Letter Agreements must be read in conjunction to determine whether the parties could reasonably have intended a different meaning of "verification."

We find nothing in either agreement that indicates that "verification" was meant to be understood other than according to its plain, ordinary, and accepted use in common speech. Moreover, to construe "verification" to mean "false verification" would render nugatory paragraph 2(a) of the Indemnification Agreement, which was reaffirmed by Amfac in the Letter Agreement. Such an interpretation would mean that Amfac could satisfy its obligation to "obtain and file of record a sewer easement" by inducing

TGH to issue a "false verification" that such had been accomplished when in fact it had not. Where the language of a contract is "susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not likely enter into, the interpretation which makes a fair, rational and probable contract must be preferred." *Management Sys. Assoc., Inc. v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1172 (4th Cir. 1985); *accord Moncrief v. Martin Oil Serv., Inc.*, 658 F.2d 768, 773 (10th Cir. 1981); *Air Transport Ass'n v. Lenkin*, 711 F. Supp. 25, 29 (D.D.C. 1989), aff'd, 899 F.2d 1265 (D.C. Cir. 1990).[5]

Furthermore, "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred." RESTATEMENT (SECOND) OF CONTRACTS § 207 (1981). Title insurance and title insurers became statutorily regulated in 1965 by Hawaii Revised Statutes (HRS) chapter 432; effective July 1, 1988, chapter 432 was extensively revised and reorganized. *See* HRS

---

[5] Both parties alleged that the other side was responsible for drafting the language of the second condition of the Letter Agreement and therefore that any ambiguities in the language should be construed against the drafter. However, the fundamental principle that any ambiguities in a contract should be interpreted most strongly against the party who has drafted the language is applicable only where a contract is open to more than one reasonable construction. *See, e.g., Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). When the contract has been negotiated between two parties of equal sophistication and equal bargaining power, the rule of interpreting ambiguities against the drafter has been held inapplicable. *See Falmouth National Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1062 (1st Cir. 1990); *Missouri Pacific Railroad Co. v. Kansas Gas & Electric Co.*, 862 F.2d 796, 800 (10th Cir. 1988).

§§ 431:20–101 through 431:20–125; Acts 347, 348, 349, Vol. 2, 1987 Haw. Sess. Laws at 309–16, 356–58, 384. HRS § 431:20–113 (1987 Spec. Pamphlet), entitled "Underwriting standards and record retention," provides in pertinent part:

(a)  No title insurance policy may be written unless and until the title insurer has caused to be conducted a reasonable search and examination of the title, and has caused to be made a determination of insurability of title *in accordance with sound underwriting practices. . . .*

(b)  Except as allowed by regulations promulgated by the commissioner, no title insurer shall knowingly issue any title insurance policy or commitment to insure without showing all outstanding, enforceable recorded liens or other interests against the property title which is to be insured.

(Emphasis added.)

Contrary to what Amfac argues by implication, TGH's issuance of an ALTA policy failing to reflect the nonexistence of a necessary easement, in consideration for Amfac's agreement to indemnify TGH against any loss arising out of the false representation, is not standard practice in the industry.[6] Standard practice in the title insurance industry has been articulated as follows:

---

[6] Amfac's memorandum in support of its motion for summary judgment omits deposition testimony of Walter R. Kuwaye, the TGH senior vice–president who handled the subject transactions, that would have included his negative response to the following question: "Is it normal practice for Title Guaranty to issue owner's title insurance policies with no exceptions based on indemnifications provided by the party requesting such policy?"

> [E]very policy . . . should set forth everything that is on record on the date of the policy unless a specific decision is made by the insurer to not show something of record because a determination has been made that it does not currently burden the property. If, on the other hand, an insurer intends to make a business decision to insure over an on record matter, the preferred method is to show the encumbrance or other matter and either specifically exclude it [from coverage] . . . or specifically insure over it in an Endorsement to the policy.

*Hawaii Commercial Real Estate Manual*, Vol. 1, chap. 11, "Title Insurance," at 11–19 (HICLE 1988). The purpose of title insurance is to reduce or mitigate the risks associated with the purchase of real property. The practice of issuing title policies based not on the results of a title search, but rather on indemnification of the title insurer, should be discouraged because it subverts the purpose of title insurance and flatly violates the mandate of HRS § 431:20–113.

In any event, Amfac betrays by its own actions that, at the time the Letter Agreement was executed, it was aware that neither party considered "false verification" to be the "verification" called for in the Letter Agreement. On May 8, 1985, twenty–three days after the execution of the Letter Agreement, Amfac caused TGH to take essentially the same action it now claims satisfies the second condition of that agreement when, for the benefit of WBIC's lender, it induced TGH to issue an ALTA mortgagee's title policy that did not include an exception for the absence of a pre–existing sewer easement in favor of Lot 54. If this were the performance that both parties had agreed would satisfy Amfac's obligations under the Letter Agreement, then

Amfac presumably would have tendered it as such. However, Amfac did not tender TGH's ALTA mortgagee's title policy to WBIC in May 1985 as satisfactory performance of the second condition of the Letter Agreement. Furthermore, Amfac did not raise this "performance" as a defense to WBIC's 1987 assertion that Amfac was still obligated under the agreements to secure the Group's joinder in the granting of the sewer easement. Finally, at the time the Letter Agreement was executed, both Amfac and WBIC were aware that TGH had committed itself to issuing the ALTA mortgagee's title policy. If "false verification" were what the parties had intended would satisfy the second condition, then WBIC would have had no reason to insist that Amfac reaffirm in the Letter Agreement all of its obligations under the Indemnification Agreement.

For the foregoing reasons, we construe "verification" according to its plain, ordinary, and accepted usage in common speech. At the time Amfac tendered TGH's commitment to issue an ALTA owner's title policy, the uncontroverted fact was that there was no pre–existing sewer easement that could be "verified." The record is undisputed that WBIC had attempted to persuade Azabu to accept from the Group an alternative to a sewer easement in favor of Lot 54 but that Azabu refused to do so. Accordingly, we conclude that no reasonable minds could agree that "false verification" would reasonably satisfy a party in WBIC's position that, as of April 1987, Lot 30–A was subject to a pre–existing sewer easement in favor of Lot 54. We hold that the circuit court did not err in ruling as a matter of law that Amfac's tendered "performance" did not satisfy the second condition of the Letter Agreement and, therefore, that Amfac breached its obligation under the Indemnification Agreement when it refused to execute the Joinder Agreement with the Group.

## B. Motion for Reconsideration

Pursuant to HRCP 59(e) (1990),[7] Amfac moved for reconsideration of the circuit court's order granting partial summary judgment in WBIC's favor; we review the circuit court's denial of the motion according to the abuse of discretion standard. *Gossinger v. Association of Apartment Owners of the Regency Ala Wai*, 73 Haw. 412, 425, 835 P.2d 627, 634 (1992) (citations omitted). Generally, to constitute an abuse of discretion a court must have clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. *State v. Akina*, 73 Haw. 75, 78, 828 P.2d 269, 271 (1992) (citation omitted).

The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. *See, e.g.*, *Gossinger*, 73 Haw. at 425–27, 835 P.2d at 634–35; *Briggs v. Hotel Corp. of the Pacific, Inc.*, 73 Haw. 276, 287 n.7, 831 P.2d 1335, 1342 n.7 (1992) ("[A] motion for reconsideration is not the time to relitigate old matters."). The only new argument that Amfac advanced in support of its motion was that the court *"should take judicial notice that title to real property inclusive of easements is traditionally verified in this jurisdiction and others by means of . . . ALTA policies."* (Emphasis in original.)[8] However, this

---

[7] HRCP 59(e) provides that "[a] motion to alter or amend the judgment shall be served no later than 10 days after entry of the judgment."

[8] While title insurance may have become the accepted means of "verification" of title in many parts of the country, including this jurisdiction, the practice has only come about because title insurance companies usually will not issue a title policy if its examination of title indicates that the title is not marketable. *See Attorney's Guide To Title*

argument could and should have been made by Amfac in support of its motion for summary judgment. *See Gossinger*, 73 Haw. at 427, 835 P.2d at 635; *Cochran v. Pflueger Automobiles, Inc.*, 72 Haw. 460, 461 n.1, 821 P.2d 934, 935 n.1 (1991). Therefore, the circuit court did not abuse its discretion in denying Amfac's motion for reconsideration.

### C. Trial Court's Final Judgment
### 1. Findings of Fact

Amfac contends that the trial court's FOF Nos. 27, 29, 30, 31, 32, and 35 are clearly erroneous. In substance,

---

*Insurance*, at 2–8 to 2–9 (Ill. Inst. for CLE 1980). Marketable title has been defined as " 'a title free from encumbrances and any reasonable doubt as to its validity, and such as a reasonably intelligent person, . . . well informed as to the facts and legal bearings, and ready and willing to perform his contract, would be willing to accept in the exercise of ordinary business prudence.' " *Kipahulu Investment Co. v. Seltzer Partnership*, 4 Haw. App. 625, 628, 675 P.2d 778, 781 (1983), *cert. denied*, 67 Haw. 685, 744 P.2d 781 (1984) (quoting *Clarke v. Title Guaranty Co.*, 44 Haw. 261, 269, 353 P.2d 1002, 1007 (1960)). In Hawaii, "[t]itle insurance has become by far the accepted and preferred method of both satisfying the buyer's requirement regarding seller's marketable title and affording the buyer (and the lender) with broader assurance of any protections as to that marketability." *Hawaii Commercial Real Estate Manual*, Vol. 1, chap. 11, "Title Insurance," at 11–7 (HICLE 1988).

In this case, because no facts and circumstances existed under which a valid unregistered easement on Land Court–registered land could be implied, *see Henmi Apartments, Inc. v. Sawyer*, 3 Haw. App. 555, 655 P.2d 881 (1982), the only means of securing a valid sewer easement for Lot 54 across Lot 30–A was Land Court recordation of such an easement grant. *See* HRS § 501–82 (1985 & Supp. 1991); *see also Packaging Products Co. v. Teruya Brothers, Ltd.*, 58 Haw. 580, 585, 574 P.2d 524, 528 (1978); *Honolulu Memorial Park, Inc. v. City and County*, 50 Haw. 189, 194, 436 P.2d 207, 210 (1967). Absent the Group's joinder in the "Grant of Nonexclusive Easement," title to Lot 54 was unmarketable. The "false policy" that Amfac proffered to WBIC was not based on the marketability of title, but rather on Amfac's agreement to indemnify TGH.

these FOFs found that Amfac, represented by Fujikawa, and WBIC, represented by Kaneshige and Chun, jointly participated in a meeting with Saunders prior to January 31, 1985. At this meeting, as a condition of the Group's execution of a sewer easement, Saunders required "a lump sum payment equal to a proportionate share of the Group's leasehold rental obligation to WDC and Queens from 1980 to that time, together with an assumption of a like proportionate share of the Group's future leasehold obligations through the life of the Group's leasehold estate." (FOF No. 30.) Amfac argues that these FOFs are clearly erroneous because the trial testimony of Amfac's Tom, Hiatt, and Fujikawa, and the corroborating testimony of Saunders, substantially support the fact that no meeting took place among Amfac, WBIC, and Saunders before WBIC's January 31, 1985 purchase of the WBH. WBIC counters that the five FOFs were substantially supported by the testimony of WBIC's Kaneshige and Reynolds, as well as certain deposition testimony of Amfac's Fujikawa that he later disavowed at trial.

A FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. *State v. Batson*, 73 Haw. 236, 246, 831 P.2d 924, 930 (1992); *State v. Nelson*, 69 Haw. 461, 469, 748 P.2d 365, 370 (1987); *Gadd v. Kelley*, 66 Haw. 431, 442–43, 667 P.2d 251, 259 (1983). Where there is substantial evidence, which is credible evidence of sufficient quantity and probative value to justify a reasonable person in reaching conclusions that support the FOFs, the FOFs cannot be set aside. *MPM Hawaiian, Inc. v. Amigos, Inc.*, 63 Haw. 485, 486–87, 630 P.2d 1075, 1077 (1981). Moreover,

" '[a]n appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence; this is the province of the trial judge.' " *Nani Koolau Co. v. K & M Construction, Inc.*, 5 Haw. App. 137, 140, 681 P.2d 580, 584 (1984) (quoting *Shannon v. Murphy*, 49 Haw. 661, 667, 426 P.2d 816, 820 (1967)).

A review of the trial record reveals that the witnesses' testimony is in conflict regarding whether the meeting in question was held prior to the closing of the sale of the WBH to WBIC. At trial, Amfac's Fujikawa, Tom, and Hiatt and the Group's Saunders testified that no such meeting took place; WBIC's Kaneshige and Reynolds testified that the meeting did in fact occur. The record reflects that the trial court based its FOFs on Kaneshige and Reynolds' trial testimony and Fujikawa's deposition testimony which, although disavowed at trial, was admissible for substantive purposes. *See* HAWAII RULES OF EVIDENCE (HRE) 613(b) and 802.1 (1985). Apparently, the trial court found Fujikawa's deposition testimony more credible than his inconsistent trial testimony.[9] In *Keller v. La Rissa, Inc.*, 60 Haw. 1, 3–4, 586 P.2d 1017, 1019 (1978), this court stated:

---

[9] At trial, Fujikawa testified that no meeting with Saunders took place prior to January 31, 1985. WBIC's trial counsel then impeached his testimony based on deposition testimony wherein Fujikawa stated unequivocally that meetings with Saunders took place both before and after the sale of the WBH to WBIC. Fujikawa's testimony concerning his understanding of the purpose of the Indemnification Agreement also meandered. At trial he testified that "[m]y understanding was that if there were any claims or action taken by Mr. Saunder's group regarding the lack of an easement, that we would then be responsible for it;" at his deposition he testified that his understanding of the purpose of the Indemnification Agreement was to insure that WBIC would incur no future costs with respect to dealings with Mr. Saunders.

It is apparent that conflicts between appellant's testimony at the trial and in her deposition, as well as the documentary evidence, cast doubt on her credibility. We have said repeatedly that it is the province of the trial judge to pass upon issues dependent on the credibility of witnesses and the weight of the evidence, and that we will not pass on such issues. *Lee v. Wong*, 57 Haw. 137, 143, 552 P.2d 635, 640 (1976); *Ed Klein, Inc. v. Hotel Kaimana, Inc.*, 51 Haw. 268, 457 P.2d 210 (1969). We accept the findings as binding upon us in this appeal.

Accepting the trial court's implicit finding that Fujikawa's deposition testimony was the more credible, we cannot say that Fujikawa's deposition testimony in conjunction with Kaneshige and Reynolds' trial testimony is not substantial evidence sufficient to support the trial court's FOFs.[10] Likewise, we are not left with a definite and firm conviction that a mistake has been committed. Accordingly, FOF Nos. 27, 29, 30, 31, 32, and 35 are not clearly erroneous and we will not disturb them on appeal.

---

[10] We note that Kaneshige's trial testimony regarding his drafting of the Indemnification Agreement was entirely consistent with the provisions therein, specifically paragraph 2(b), which provided that no party except Amfac with an interest in the WBH would have a *continuing* obligation "to pay any amounts, either lump sum or in installments," for the granting of the sewer easement. At trial, Kaneshige testified that he had included such language "[b]ecause there may be — there may have been a negotiated amount either in lump sum or installments or both which AMFAC could subsequently negotiate with the Saunders group, but I wanted to make it clear in this subparagraph that whatever was negotiated was not to be paid by WBIC or any of the other parties because the owners really laid [sic – probably "relied"] on AMFAC."

## 2. Conclusions of Law

A COL is not binding upon an appellate court and is freely reviewable for its correctness. *See, e.g., **Nani Koolau Co.**,* 5 Haw. App. at 141, 681 P.2d at 585 (citing ***Molokoa Village Development Co. v. Kauai Electric Co.**,* 60 Haw. 582, 593 P.2d 375 (1979)). A COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. *Id.* at 141, 681 P.2d at 585 (citing ***Friedrich v. Department of Transportation**,* 60 Haw. 32, 586 P.2d 1037 (1978)). However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because "the court's conclusions are dependent upon the facts and circumstances of each individual case." ***Coll v. McCarthy**,* 72 Haw. 20, 28, 804 P.2d 881, 886 (1991); *see* ***Cho Mark Oriental Food, Ltd. v. K & K International**,* 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992). Both parties challenge a number of the trial court's COLs and we review them seriatim.

### a. "Law of the case" doctrine

Amfac contends that the trial court erred in COL No. 19 because it violated the "law of the case" doctrine when it did not limit or restrict WBIC's recovery of damages to the standard of "reasonableness" required under indemnity contracts, as recognized by the circuit court's previous interlocutory order denying WBIC's motion for determination of damages.[11] The trial court did not limit WBIC's damages to the "reasonableness" standard for

---

[11] Amfac also argues that COL No. 19 is erroneous because the standard for recovery of damages for a breach of contract is "fair and reasonable." However, it cites no authority for this proposition. The phrase "fairly and reasonably" is contained in the principles enunciated in

indemnity contracts because it concluded that the Indemnification Agreement, in addition to being an indemnity contract as provided for in paragraph 1, was also a bilateral executory contract as described in paragraphs 2(a) and 2(b).

The Hawaii Intermediate Court of Appeals (ICA) has defined the "law of the case" doctrine as follows:

---

*Hadley v. Baxendale*, 9 Exch. 341 (1854), for awarding damages for a breach of contract. In *Jones v. Johnson*, 41 Haw. 389, *reh'g denied*, 41 Haw. 651 (1956), this court articulated the rule of *Hadley v. Baxendale* as follows:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may *fairly and reasonably be considered either arising naturally*; i.e., according to the usual course of things, from such breach of contract itself, *or such as may reasonably be supposed to have been in the contemplation of both parties at the same time they made the contract as the probable result of the breach*.

*Jones*, 41 Haw. at 393–94 (emphasis added). However, our courts have never cited *Jones* as authority for the first branch of the rule employing the phrase "fairly and reasonably," but only for the second branch of the rule that approves the awarding of contract damages that are *foreseeable*, i.e., "such as may reasonably be supposed to have been in the contemplation of the parties at the time the contract was entered into." *See, e.g.*, *Bow v. Nakamura*, 6 Haw. App. 290, 293, 719 P.2d 1103, 1106 (1986). In contrast, the general rule of contract damages set forth by the court in *Ferreira v. Honolulu Star–Bulletin, Ltd.*, 44 Haw. 567, 573–74, 356 P.2d 651, 655, *reh'g denied*, 44 Haw. 581, 357 P.2d 112 (1960), "that, when one sustains loss by breach of contract, he is entitled to have just compensation commensurate with his loss" has been quoted in numerous cases. *See, e.g.*, *Chung v. Kaonohi Center Co.*, 62 Haw. 594, 604, 618 P.2d 283, 290 (1980); *Uyemura v. Wick*, 57 Haw. 102, 110–11, 551 P.2d 171, 177 (1976); *Burgess v. Arita*, 5 Haw. App. 581, 588, 704 P.2d 930, 936 (1985). Courts have incorporated the first branch of the *Hadley v. Baxendale* rule into their consideration of whether the damages in question were foreseeable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. f (1981); A. CORBIN, CORBIN ON CONTRACTS § 1010 (1964).

> The phrase "law of the case" has . . . been used in discussing, *inter alia*, the question whether a trial court judge is bound to follow a prior interlocutory decision of fact or law made in the same case by another judge of the same court. [5 Am. Jur. 2d *Appeal and Error* § 744 (1962)]. This is a rule of practice based on considerations of efficiency, courtesy, and comity. ***Wong v. City and County of Honolulu***, 66 Haw. 389, 665 P.2d 157 (1983); ***Gallas v. Sanchez***, 48 Haw. 370, 405 P.2d 772 (1965); Annot., 132 A.L.R. 14–89 (1941).

***State v. Goodwin***, 7 Haw. App. 261, 263 n.2, 752 P.2d 598, 600 n.2 (1988). However, the doctrine is inapplicable to this case because the circuit court's interlocutory order did not address the question whether the Indemnification Agreement was also a bilateral executory contract; neither did it address the question whether "reasonableness" was the only applicable standard for measuring damages recoverable under an indemnity contract. Therefore, the trial court did not violate the law of the case doctrine and COL No. 19 is not clearly erroneous.

### b. **Notification or demand as prerequisite to right of recovery**

Amfac argues that the trial court erred in COL No. 21 when it concluded that "WBIC was not required to notify Amfac or demand that it perform its obligations under paragraphs 2(a) and 2(b) of . . . [the Indemnification Agreement] as a prerequisite to its right to recover damages." We disagree. As correctly noted by the trial court in COL No. 20, "no notice or demand for performance is required . . . [w]here a contracting party's executory obligation to perform is complete and unconditional under the terms of the contract, and where the obligor has the same

means to perform his obligation as the party to whom performance is due . . . ." *See, e.g.*, ***Ramesbotham v. Farmers Elevator Co.***, 428 N.W.2d 542 (S.D. 1988) (citing 17 Am. Jur. 2d *Contracts* § 356 (1964)); ***Witherell v. Lasky***, 145 N.Y.S.2d 624, 627 (1955); ***Cole v. Findley Tool & Die Co.***, 290 Mich. 199, 204, 287 N.W. 433, 435 (1939).

Our review of paragraph 2(a) of the Indemnification Agreement confirms that Amfac's obligation to "obtain and file of record a sewer easement" became absolute and unconditional when WBIC closed the sale of the WBH. Amfac's obligation was not altered by the Letter Agreement because that instrument merely provided that the indemnity provisions of the Indemnification Agreement would terminate upon Amfac's performance of either of two alternatives, i.e., the Group's grant of a sewer easement in favor of Lot 54 or verification by TGH that such an easement existed. Accordingly, COL No. 21 is not clearly erroneous.

### c. Assumption of risk defense

Amfac contends the trial court erred in COL No. 23 by concluding that "Amfac assumed the risk of all the obligations undertaken by WBIC to the Group under [The Joinder Agreement]." We agree with Amfac. The assumption of risk defense is generally applied to claims for relief sounding in tort. *See* Annotation, *Contributory Negligence or Assumption of Risk as Defense to Action for Personal Injury, Death, or Property Damage Resulting From Alleged Breach of Implied Warranty*, 4 A.L.R.3D 501, 502 (1965);[12] Annotation, *Distinction Between Assumption of Risk and Contributory Negligence,*

---

[12] Although the defense of assumption of risk has been allowed by some jurisdictions in a breach of implied warranty action, and such an

82 A.L.R.2D 1218, 1221 (1962). The assumption of risk doctrine has most frequently been applied, within the context of contractual relationships, in master–servant cases or other cases involving a contract for services or other consensual relationships, such as host and guest or carrier and passenger. *Id.* at 1222–23; *see also* ***Haworth v. State***, 60 Haw. 557, 561, 592 P.2d 820, 823 (1979).

In the present case, because WBIC's claim for damages was premised solely on Amfac's breach of the Indemnification Agreement and not on any claim that Amfac had committed a tort against WBIC, the trial court erroneously applied the assumption of risk doctrine to dispose of Amfac's argument that WBIC had made payments to the Group "voluntarily" and WBIC's counter–argument that Amfac had "assumed the risk" of WBIC's actions when Amfac breached the Indemnification Agreement. Whether Amfac should be liable to WBIC for the amounts that WBIC paid to the Group to secure its execution of the Joinder Agreement was properly adjudicated pursuant to the contract doctrine of foreseeability of damages.[13] Therefore, although we hold that the trial court

---

action is superficially based on an implied contract between manufacturer/seller and buyer/user, it is really premised on products liability theory. *See* 4 A.L.R.3D at 502–04.

[13] In the context of determining damages for the breach of an indemnification contract, courts have utilized the term "assumption of risk" where an indemnitee settles a claim that has not been adjudicated and then seeks to recover the settlement amount from the indemnitor. *See, e.g.*, ***Daily Express, Inc. v. Northern Neck Transfer Corp.***, 490 F. Supp. 1304, 1307 (M.D. Pa. 1980) ("[H]e [the indemnitee] assumes the risk in an action against the indemnitor of proving not only that he was [actually] liable to the third party, but also that the amount of settlement was reasonable."). However, such use of the term does not mean

erred in applying the assumption of risk defense to the present case, the error was harmless because it was irrelevant to the adjudication of Amfac's liability to WBIC arising out of Amfac's breach of the Indemnification Agreement.

### d. Damages awarded for initial lump sum payment

Pursuant to COL Nos. 24 and 25, the trial court awarded WBIC the sum of $200,000.00, being the initial lump sum payment WBIC made to the Group on April 30, 1987 as partial consideration for the Group's execution of the Joinder Agreement, "as damages by reason of Amfac's breach of the Indemnification Agreement." Amfac argues that these COLs are erroneous because the contemplation of the parties to the Indemnification Agreement was that the "costs" referred to in paragraph 2(a) would be "determined judicially" on the basis of "fair market value considerations;" from this premise Amfac urges that WBIC's execution of the Joinder Agreement (obligating WBIC, *inter alia*, to pay the Group the sum of $200,000.00) was neither foreseeable nor contemplated by the parties at the time Amfac executed the Indemnification Agreement.

Amfac supports its argument on the basis of Tom's testimony that, as co–drafter of the Indemnification Agreement, he intended that the language "any and all costs" would be subject to fair market valuation. Amfac's position is misplaced, however, because parol evidence

---

that the defense of assumption of risk is applicable to pure contract claims. Courts employ the term "assumption of risk" in the context of allocating losses between contracting parties and not as an affirmative defense to be raised by breaching parties as a shield against liability. *See* RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. f (1981); A. CORBIN, CORBIN ON CONTRACTS § 1010 (1964).

regarding the parties' intent as to the language used in a contract may be considered only when the contract language is ambiguous. *See, e.g., **MPM Hawaiian, Inc. v. World Square**, 4 Haw. App. 341, 345–46, 666 P.2d 622, 625 (1983) (where the contract was unambiguous, the parol evidence rule was applicable and " 'extrinsic evidence of the surrounding facts and circumstances existing prior to, contemporaneously with and subsequent to [its] execution' " could not be considered) (citing **Midkiff v. Castle & Cooke, Inc.**, 45 Haw. 409, 422, 368 P.2d 887, 894 (1962)).

In the present case, the trial court concluded in COL No. 9 that the Indemnification Agreement was unambiguous. On appeal, Amfac has not challenged this COL and therefore we treat it as binding on this court. *See* Hawaii Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(C) (1984); *cf. **Leibert v. Finance Factors, Ltd.***, 71 Haw. 285, 288, 788 P.2d 833, 835 (1990). Because the Indemnification Agreement is unambiguous, the parol evidence rule precludes Tom's testimony as to the meaning of the phrase "any and all costs" in paragraph 2(a).[14]

---

[14] Even if the phrase "any and all costs" could be considered ambiguous within the context of paragraph 2(a) of the Indemnification Agreement, the testimony of Kaneshige, who was the principal drafter of the instrument (FOF No. 36), would support a finding that the phrase meant exactly what it said. Kaneshige testified that by employing such language he "wanted to make it clear that the obligations to obtain a sewer easement was that solely of AMFAC and that *any cost in connection with that grant would be borne by AMFAC not WBIC.*" (Emphasis added.) Kaneshige's testimony was corroborated by Fujikawa's deposition testimony, which he disavowed at trial, wherein he stated that his understanding of the intent of the Indemnification Agreement was to assure WBIC that it would incur no future cost with respect to any dealings with the Group. Tom, who reviewed the document with Kaneshige before it was finalized, testified that he made only handwritten changes to the document. None of the handwritten

Nevertheless, COL Nos. 24 and 25 are clearly erroneous because, according to the trial court's own FOFs, not all of WBIC's $200,000.00 lump sum payment to the Group was foreseeable. In FOF No. 30, the trial court found that:

> At the meeting [held prior to January 31, 1985] . . . , Saunders demanded, as a condition to the Group's execution of a sewer easement for the Sewer Line, *a lump sum payment equal to a proportionate share of the Group's leasehold rental obligations to WDC and Queens from 1980 to that time* . . . . Saunders determined the proportionate share by dividing the total square foot area of Lot 30–A into the total square foot area of Roadway Easement "H" on Lot 30–A. This proportionate figure was approximately 14%. . . . Testimony of Melvin Kaneshige; Deposition testimony of George Fujikawa, read and disavowed at trial.

(Emphasis added.) Kaneshige testified that Saunders had "wanted some money for . . . what he considered 'rent' for past use of the sewer easement." However, the record reflects that the entire lump sum payment of $200,000.00 comprised more than the Group's lease rent payments from 1980 to January 31, 1985.

Saunders testified that he derived a lump sum rent figure of $167,713.32 based on seventy–nine months of prior use of Lot 30–A multiplied by fourteen percent of the Group's monthly lease rents to Queen's under the

---

changes affected the phrase "any and all costs," and Tom's testimony reveals that, if he indeed had any intent concerning what the phrase meant at the time he reviewed the Indemnification Agreement with Kaneshige, he never communicated his state of mind to Kaneshige.

master lease and to WDC under the sublease.[15] The difference between the lump sum of $200,000.00 and the $167,713.32 rent amount represented the proportionate figure that Saunders estimated was due and owing for real property taxes. Fourteen percent of the Group's lease rent obligations from 1980 to January 31, 1985 obviously does not include real property taxes and, therefore, by the express terms of FOF No. 30, the payment of monies for such taxes would not have been foreseeable, i.e., "in the contemplation of the parties" at the time the Indemnification Agreement was executed. *See Jones v. Johnson*, 41 Haw. 389, 394, *reh'g denied*, 41 Haw. 651 (1956); *Bow v. Nakamura*, 6 Haw. App. 290, 293, 719 P.2d 1103, 1106 (1986). Accordingly, we hold that COL Nos. 24 and 25 are clearly erroneous and that WBIC is not entitled to recover from Amfac that portion of the $200,000.00 lump sum payment allocable to the Group's estimated real property taxes.

### e. **Damages denied for future payments**

In COL Nos. 26 and 27, the trial court ruled that WBIC was not entitled to compensation for payments that it agreed to make to the Group, under the Joinder Agreement, as partial reimbursement for the Group's future lease rent and real property tax obligations because these payments were "beyond the contemplation or foreseeability of the parties when they negotiated the Indemnification Agreement." WBIC contends that the trial court erred by misapplying the doctrine of foreseeability, thereby depriving WBIC of the full

---

[15] The seventy–nine months of prior use reflected the time Amfac started construction of the WBH sewer line until April 30, 1987, which was Saunders' approximation of the Joinder Agreement's execution date.

compensation to which it was entitled as a result of Amfac's breach of the Indemnification Agreement. We agree.

"It is now a well established principle in the law of damages that, when one sustains a loss by breach of a contract, he is entitled to have just compensation commensurate with his loss" and "that damages awarded should be in such amount as will actually or as precisely as possible compensate the injured party." *Ferreira v. Honolulu Star–Bulletin, Ltd.*, 44 Haw. 567, 573–74, 356 P.2d 651, 655, *reh'g denied*, 44 Haw. 581, 357 P.2d 112 (1960). The *Ferreira* rule is limited by the doctrines of legal causation and foreseeability enunciated by the court in *Jones* as follows:

> The general rule is that in an action for damages for breach of contract only such damages can be recovered as are the natural and proximate consequence of its breach; that the damages recoverable must be incidental to the contract and be caused by its breach; as the cases express it, "such as may reasonably be supposed to have been in the contemplation of the parties at the time the contract was entered into."

41 Haw. at 393 (citation omitted) (quoted in *Bow*, 6 Haw. App. at 293, 719 P.2d at 1106).

Kaneshige testified that at the first meeting between representatives of Amfac, WBIC, and the Group, held prior to January 31, 1985, Saunders took the position that the Group required partial compensation both for past "rent" allocable to the use of the sewer easement and for "future rent for the sewer easement so long as he and . . . [the Group] had [a] leasehold position on the property." He testified that Saunders wanted to determine the

amount to be paid for the Group's consent to the sewer easement based "on the percentage of land area that was taken by the sewer easement and he did it on a two–dimensional basis;" put differently, Saunders wanted to use the ratio of the square footage of Easement H to the total square footage of Lot 30–A multiplied by the Group's total rent obligation with respect to Lot 30–A to determine the consideration to be paid by WBIC for the sewer easement. Although the exact amount of the consideration to be paid by WBIC for the sewer easement was not specifically quantified at the meeting, the arithmetic computation could readily have been performed because the Group's rent obligations were expressly fixed by the master lease and sublease governing Lot 30–A. Indeed, Saunders performed this precise computation when he derived the fourteen percent payment figure reflected in the Joinder Agreement.[16] Therefore, at the time the Indemnification Agreement was executed, both Amfac and WBIC were aware that the Group would require lump sum consideration from WBIC representing past use of the sewer easement, as well as future monthly payments for its use. Both parties were likewise aware of the formula by which the Group would compute these amounts.

Although the trial court correctly concluded in COL No. 17 that "[f]oreseeability does not require an actual recognition by the parties at the time of contracting of the details or specifics of the injury or the damages which

---

[16] Saunders testified, in response to the question "How did you arrive at the figure of 14 percent?," that he arrived at the percentage figure "[b]y dividing the square footage of the area designated as Easement H" and "[i]t was 4468 square feet within Easement 'H', but still a part of Lot 30A and I divided that by the aggregate, square feet within Lot 30A of 31,776 square feet."

thereafter followed," it nevertheless restricted WBIC's recovery to the lump sum payment for *past* use of the sewer easement (COL Nos. 24 and 25) and did not hold Amfac liable for *future* payments to the Group for the same use (COL Nos. 26 and 27). COL Nos. 24 and 25 are logically inconsistent with COL Nos. 26 and 27 because WBIC's obligations to compensate the Group for past *and* future use of the sewer easement were equally foreseeable and contemplated by the parties at the time the Indemnification Agreement was executed.[17]

Amfac argues that, simply because it was aware of the Group's longstanding demand that the WBH owner obtain sewer easement rights, it does not follow that Amfac "contemplated" the same requirement at the time the Indemnification Agreement was executed. Amfac contends that "mutual assent" is required for such "contemplation" and that "mutual assent" was lacking when it expressly rejected the Group's demands after the first meeting with Saunders. We disagree.

It is well established that a court will construe the plain and unambiguous language of a contract in determining whether particular damages were reasonably within the contemplation of the parties. *See* RESTATE-

---

[17] The language of the Indemnification Agreement itself supports the conclusion that the Group's demands were within the contemplation of the parties at the time of execution. FOF No. 38 recognizes that fact:

> The language "either lump sum or in installments" in Paragraph 2(b), Page 2 of the Indemnification Agreement was inserted by Kaneshige in order to cover the Saunders claim.

Kaneshige testified that he drafted paragraph 2(b) of the Indemnification Agreement as he did because of the probability that "there may have been a negotiated amount either in lump sum or installments or both which AMFAC could subsequently negotiate with the Saunders group."

MENT (SECOND) OF CONTRACTS § 351 cmt. a & b (1981); A. CORBIN, CORBIN ON CONTRACTS § 1010 (1964). Moreover, "[d]amages . . . which might have been prevented if the parties had acted according to the scope of the agreement are direct, and should be awarded." *Mortimer v. Otto*, 206 N.Y. 89, 99 N.E. 189, 190 (1912) (cited in *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179, 540 N.Y.S.2d 1, 4 (1989)).

Had Amfac secured a sewer easement from the Group, as paragraph 2(a) of the Indemnification Agreement obligated Amfac to do, in 1985, WBIC would not have been faced with the potential inability to close the sale of the WBH to Azabu for failure to produce marketable title resulting from the lack of a recorded sewer easement. WBIC was left with little choice but to secure the sewer easement from the Group by way of the Joinder Agreement. Without the sewer easement, WBIC risked losing a profit of $13,000,000.00[18] and subjecting itself to a potential lawsuit from Azabu for damages or specific performance.[19] Thus, by discharging its obligation under the Indemnification Agreement, Amfac could have rescued WBIC from having to incur the cost (which included fourteen percent of the Group's past and future rent obligations to Queens, as master lessor, and WDC, as sublessor) of the Joinder Agreement. Because WBIC's counterclaim sought to recover this cost from Amfac as damages

---

[18] WBIC purchased the WBH from Amfac for $27,000,000 and spent approximately $20,000,000 on improvements. Accordingly, when it sold the WBH to Azabu in April 1987 for $60,000,000, WBIC realized a profit of approximately $13,000,000.

[19] The Azabu Purchase Agreement provided in relevant part that "[i]n the event of default by Seller [WBIC], Purchaser [Azabu] may sue for specific performance or damages or both under this Agreement."

for Amfac's breach of its contractual obligation to "obtain and file of record a sewer easement" in favor of Lot 54, the trial court erred in not ordering Amfac to assume WBIC's obligation to make partial future payments of lease rent under the Joinder Agreement. It therefore follows, and we so hold, that both the portion of the $200,000.00 lump sum payment attributable to past lease rent payments and the future monthly payments of lease rent required by the Joinder Agreement were "within the contemplation of the parties" at the time the Indemnification Agreement was executed, and WBIC is entitled to recover these amounts from Amfac.

However, as we have discussed, "lease rent" does not include "real property taxes"; therefore, WBIC's obligation to pay fourteen percent of the Group's future real property taxes, as required by the Joinder Agreement, was not "within the contemplation of the parties" at the time the Indemnification Agreement was executed. Accordingly, we hold that Amfac is not liable to WBIC for any such future payments.[20]

### f. **Attorney's fees awarded for declaratory judgment action**

In COL No. 37, the trial court concluded in relevant part:

> WBIC is . . . the prevailing party as to Amfac's Complaint for Declaratory Relief, which

---

[20] Our holdings with respect to Amfac's liability to WBIC for damages attributable to WBIC's contractual burden to the Group, under the Joinder Agreement, to make ongoing partial payments of the Group's rent and real property tax obligations effectively disposes of Amfac's argument that the trial court abused its discretion in the exercise of its equitable power (COL 28).

Complaint did not seek an imposition of monetary liability, but solely an adjudication of rights. Where a party prevails on a claim which did not seek an award of monetary damages, he is entitled under § 607–17, H.R.S. to an unlimited reasonable attorney's fees [sic] for services reasonably and necessarily incurred. *Smothers v. Renander*, [2 Haw. App. 400, 406–07, 633 P.2d 556, 562–63 (1981)]; *Food Pantry v. Waikiki Business Plaza*, 58 Haw. 606, 618[–21, 575 P.2d 869, 878–80] (1978). WBIC is entitled to an award of reasonable attorney's fees for the claims asserted in Amfac's Complaint of $42,455.35.

Amfac contends that the trial court erred in COL No. 37 by concluding that attorney's fees awardable to WBIC, as the prevailing party on Amfac's complaint for declaratory judgment, were unconstrained by the twenty–five percent limit set forth in HRS § 607–17 (1985). We disagree.

HRS § 607–17 provides in relevant part:

Any other law to the contrary notwithstanding, where an action is instituted in the district or circuit court on a promissory note or other contract in writing which provides for an attorney's fee the following rates shall prevail and shall be awarded to the successful party, whether plaintiff or defendant:

  (1)  Where the note or other contract in writing provides for a fee of twenty–five per cent or more, or provides for a reasonable attorney's fee, not more than twenty–five per cent shall be allowed;

. . . .

provided that the fee allowed in any of the above cases shall not exceed that which is deemed reasonable by the court.

In *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 575 P.2d 869 (1978), this court recognized the inequity of enforcing the twenty–five percent statutory ceiling against the prevailing party on an award of nominal damages and held that, in cases where no monetary judgment has been sought, the prevailing party is entitled to attorney's fees "reasonably and necessarily incurred" in the action. 58 Haw. at 621, 575 P.2d at 880. The rationale of the *Food Pantry* rule is that if no money damages are sought or awarded, as in a complaint for declaratory judgment, there is no monetary amount on the basis of which to calculate the twenty–five percent statutory ceiling for attorney's fees.

The *Food Pantry* rule has been followed in subsequent appellate decisions. *See, e.g.*, *Tradewinds Hotel, Inc. v. Cochran*, 8 Haw. App. 256, 270, 799 P.2d 60, 68 (1990) (declaratory judgment on question of lease violation); *Smothers v. Renander*, 2 Haw. App. 400, 407, 633 P.2d 556, 563 (1981) (adjudication of contract rights where no money damages at issue). In its complaint, Amfac was not seeking a monetary judgment, but rather a declaration that it had performed its obligations under the Indemnification Agreement and, therefore, had not breached the agreement. The application of the *Food Pantry* rule entitles WBIC, as the prevailing party, to attorney's fees "reasonably and necessarily incurred" in defending against Amfac's declaratory judgment action.

Nevertheless, Amfac contends that application of the *Food Pantry* rule to this case "place[s] form over substance" because "the attorney's fees incurred in defense

of Amfac's [c]omplaint . . . are the same as those incurred in establishing the right to indemnification under the [c]ounterclaim." However, Amfac does not challenge FOF No. 82, in which the trial court found that WBIC had incurred $42,445.35 in attorney's fees specifically attributable to Amfac's declaratory judgment action and $83,351.33 specifically attributable to WBIC's counterclaim. Alleged error in findings of fact not expressly challenged on appeal will be disregarded in the absence of plain error. *See* Hawaii Rules of Appellate Procedure (HRAP) 28(b)(4)(C). Moreover, Amfac does not support its contention that WBIC's attorney's fees incurred in connection with the complaint and counterclaim are the same with any evidence whatsoever. Finally, we note that if Amfac had prevailed on its declaratory judgment action, it most likely would be arguing that the *Food Pantry* rule should be applied.

Thus, we hold that COL No. 37 was not clearly erroneous in concluding that the twenty–five percent limit on attorney's fees set forth in HRS § 607–17 was inapplicable to Amfac's declaratory judgment action and that, under the *Food Pantry* rule, WBIC was entitled to recover attorney's fees "reasonably and necessarily incurred" in defending against Amfac's action.[21]

### g. **Attorney's fees awarded for counterclaim**

In COL No. 36, pursuant to HRS § 607–17, the trial court awarded WBIC attorney's fees in the amount

---

[21] We need not review the amount of attorney's fees awarded to WBIC on Amfac's declaratory judgment action for abuse of discretion because Amfac has not challenged the reasonableness of the amount awarded by the trial court.

of $50,000.00 (being twenty–five percent of $200,000.00) incurred in successfully prosecuting its counter-claim.[22] WBIC contends that COL No. 36 is erroneous because the trial court failed to include prejudgment interest and the monthly partial payments paid by WBIC to the Group for "future" rent and real property taxes on Lot 54, as required by the Joinder Agreement, in the judgment amount upon which the attorney's fees were calculated. We agree in part. The trial court did not abuse its discretion in denying WBIC prejudgment interest as part of the judgment. *See* Section II. C. 2. h., *infra*. However, in accordance with our discussion and holding in Section II. C. 2. e. of this opinion, the trial court should have considered, in calculating WBIC's attorney's fees, the monthly payments made pursuant to the Joinder Agreement reflecting fourteen percent of the Group's future lease rent obligations. Accordingly, we hold that the trial court abused its discretion when it awarded WBIC $50,000.00 for attorney's fees without taking these monthly payments into account.

## h. **Denial of prejudgment interest**

Prejudgment interest, where appropriate, is awardable under HRS § 636–16 (1985) in the discretion of the trial court. *Schmidt v. Board of Dirs. of Association of Apartment Owners of Marco Polo Apartments*, 73 Haw. 526, 533, 836 P.2d 479, 483 (1992); *Leibert v. Finance Factors, Ltd.*, 71 Haw. 285, 293, 788 P.2d 833,

---

[22] As noted above, in FOF No. 82 the trial court found that WBIC incurred $83,351.33 in attorney's fees directly attributable to its counterclaim.

838 (1990). We review the trial court's denial of WBIC's claim for prejudgment interest for an abuse of discretion.

HRS § 636–16 provides:

> In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

The " 'purpose of the statute . . . [is] to allow the court to designate the commencement date of interest in order to correct injustice when a judgment is delayed for a long period of time for any reason, including litigation delays.' " *Schmidt*, 73 Haw. at 534, 836 P.2d at 483; *Leibert*, 71 Haw. at 293, 788 P.2d at 838; *see also* **Wiegand v. Colbert** 68 Haw. 472, 477–78, 718 P.2d 1080, 1084 (1986) ("[T]he legislative history shows [that] the purposes of the statute were to permit more equitable results and to more speedily resolve cases.") Because there is no evidence in the record that any of Amfac's conduct unduly delayed the proceedings in this case, we hold that the trial court did not abuse its discretion in denying WBIC prejudgment interest.

### i. **Denial of punitive damages**

In COL Nos. 29 and 31, the trial court denied WBIC's prayer for punitive damages, concluding that WBIC's claim was "not supported by the evidence" and being unable to "find any intentional or deliberate action by Amfac which [would] warrant[] or justif[y]" such an award. WBIC contends that these COLs are erroneous

because "the manifest weight of evidence supports . . . an award" of punitive damages. Amfac counters that the trial court correctly denied WBIC's punitive damage claim because "there is an absence of clear and convincing evidence that Amfac breached the Indemnification Agreement maliciously or wantonly."

Award or denial of punitive damages is within the sound discretion of the trier of fact. *See, e.g.,* ***Sterling v. Velsicol Chemical Corp.****,* 647 F. Supp. 303, 323 (W.D. Tenn. 1986), *rev'd in part on other grounds,* 855 F.2d 1188 (1988); ***Haskins v. Shelden****,* 558 P.2d 487, 494 (Alaska 1976); ***Newman v. Basin Motor Co.****,* 98 N.M. 39, 644 P.2d 553, 558 (N.M. Ct. App. 1982); RESTATEMENT (SECOND) OF TORTS § 908 cmt. d (1979). The trier of fact's decision to grant or deny punitive damages will be reversed only for a clear abuse of discretion. ***Haskins****,* 558 P.2d at 494.

In ***Masaki v. General Motors Corp.****,* 71 Haw. 1, 16–17, 780 P.2d 566, 575 (1989), we established the requisite standard of proof in this jurisdiction to support an award of punitive damages:

> [F]or . . . punitive damage claims we adopt the clear and convincing standard of proof. The plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

(Citation omitted.) Upon review of the record, we conclude that there is no clear and convincing evidence that Amfac

wantonly, oppressively, maliciously, or wilfully breached the Indemnification and Letter Agreements such as to warrant the imposition of punitive damages.[23] Accordingly, we hold that the trial court did not abuse its discretion in denying WBIC's punitive damages claim.

## III.

We affirm the circuit court's orders granting partial summary judgment as to liability in favor of WBIC and denying Amfac's motion for reconsideration. We vacate the trial court's final judgment and remand for a determination of damages and attorney's fees consistent with this opinion. We order the trial court to enter an order, consistent with this opinion, directing Amfac to assume WBIC's obligation to make partial future payments of lease rent under the Joinder Agreement. Finally, with the exception of COL No. 23, which was harmless error, we affirm the trial court's judgment in all other respects.

---

[23] Because the purpose of punitive damages is not compensation of the plaintiff, but rather punishment and deterrence, such damages are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate. *Masaki*, 71 Haw. at 6, 780 P.2d at 570.

Although this court has recognized that punitive damages may be awarded for a breach of contract, *see generally* **Quedding v. Arisumi Brothers, Inc.**, 66 Haw. 335, 661 P.2d 706 (1983), we have also limited such a recovery to instances in which the contract is breached in such a wilful, wanton, or reckless manner as to result in a tortious injury. *See* **Dold v. Outrigger Hotel**, 54 Haw. 18, 22, 501 P.2d 368, 372 (1972); *accord* **Resco, Inc. v. Founders Title Group, Inc.**, 751 F. Supp. 1442, 1443–46 (D. Haw. 1990) (construing *Dold* as recognizing an action for tortious breach of contract); **Cuson v. Maryland Casualty Co.**, 735 F. Supp. 966, 970 (D. Haw. 1990) ("Breach of contract in Hawaii must result in 'tortious injury' to justify an award of punitive damages.").

On the briefs:

*Dale W. Lee* and *David L. Monroy* (Kobayashi, Sugita & Goda) for plaintiff, counterdefendant–appellee, cross–appellant and additional counterdefendants–appellees Amfac, Inc., Waikiki Beachcomber, Island Holidays, Ltd., Waicomber Corporation.

*James M. Sattler* (*W. Thomas Fagan* and *Kelvin H. Kaneshiro* of Reinwald, O'Connor, Marrack, Hoskins & Playdon) for defendant, counterclaimant–appellant Waikiki Beachcomber Investment Company.